Rita Sanders GEIER, et al., Plaintiffs,

United States of America, Plaintiff–Intervenor,

Raymond A. Richardson, Jr., et al., Plaintiff–Intervenors,

H. Coleman McGinnis, et al., Plaintiff–Intervenors,

v.

Don SUNDQUIST, et al., Defendants.

No. Civ.A. 5077.

United States District Court, M.D. Tennessee, Nashville Division.

Jan. 4, 2001.

George Barrett, Barrett, Johnston & Parsley, Nashville, TN, for plaintiffs Geier, et al.

Lawrence R. Baca, Kenneth D. Johnson, Michael S. Maurer, U.S. Department of Justice, Civil Rights Division–Educational Opportunity Section, Washington DC, Quenton I. White, U.S. Attorney, Robert C. Watson, Asst. U.S. Attorney, Nashville, TN, for plaintiff/intervenor USA.

Richard Dinkins, Dodson Parker Dinkins & Behm, Nashville, TN, Melissa Woods, NAACP Legal Defense and Educational Fund, Inc., New York City, for plaintiffs/intervenors Richardson, et al.

John L. Norris, James L. Weatherly, Hollins, Wagster & Yarbrough, Nashville, TN, for plaintiffs/intervenors McGinnis, et al.

Kate Eyler, Kevin Steiling, Office of the Attorney General of the State of Tennessee, Nashville TN, Paul Summers, Attorney General of Tennessee, Nashville, TN, for defendants.

Lewis L. Laska, J.D., Ph.D., Professor of Business Law, Tennessee State University, Nashville, TN, for amicus curiae.

Carlos Gonzalez, Atlanta, GA, Mediator.

## CONSENT DECREE

WISEMAN, Senior District Judge.

## TABLE OF CONTENTS

A. INTRODUCTION .................................................521

B. MIDDLE TENNESSEE ...........................................522

    I. Tennessee State University .............................522
        A. Establishment of the TSU Coordinating Committee....................522
        B. Administrative Enhancements.........................522
        C. Recruitment of Other–Race and Nontraditional Students .............524
        D. Institutional Public Relations ........................524
        E. Establishment of a College of Public Service and Urban Affairs and Program Exclusivity ........................525
        F. Endowment for Educational Excellence .............................525
        G. Facilities Review.......................................527
        H. Community Service and Outreach.......................527
        I. Minimum First–Time Freshman Admission Standards and Retention ........................528
        J. Revitalization of the Downtown Williams Campus and Outreach to Nontraditional Students ......................530
        K. Establishment of a Public Law School at TSU .........................531
    II. The Proposed Davidson County Community College .....................533
        A. Establishment of the Proposed Community College or Technical Community College in Davidson Country ..........................533
        B. Relationship Between the Proposed Community College or Technical Community College and Tennessee State University..............533
    III. Middle Tennessee State University ......................533
    IV. Relationship Between Middle Tennessee Institutions ....................534
    V. New Program Development, Program Termination and Program Exclusivity in Middle Tennessee ....................534

C. STATEWIDE ISSUES ...........................................535
    I. Faculty and Administrative Hiring and Retention ........................535
        A. UT and TBR Committees on Faculty and Administrative Hiring.....535
        B. Specific Actions in Addition to the Recommendations of the Committees........................536
        C. Employment Search Practices Within the TBR and UT Systems ........537

    II. Other–Race Undergraduate Student Recruitment and Retention Within the UT System ......................538
        A. UT System Study of Minority Recruitment .........................538
        B. Specific Actions in Addition to the Committee's Recommendations.....539

    III. Other–Race Undergraduate Student Recruitment and Retention Within the TBR System ......................540
        A. TBR Study of Minority Recruitment ..............................540
        B. Specific Actions in Addition to the Committee's Recommendations.....542

    IV. Institutional Commitment to the Recruitment of Other–Race Students ......................543

    V. Graduate Recruitment and Enrollment at Tennessee Technological University......................543

    VI. Student Retention and Persistence ..............................544
    VII. Expanding Cooperative Extension and Agricultural Research Collaboration Between TSU and UTIA ..................545
        A. Extension ..............................................545
        B. Agricultural Research ..................................545

D.  OVERSIGHT ............................................................ 545
  I.  **Right to Petition the Court to Review Acts of Alleged Non–Compliance** ......................................... 545
  II.  **Court–Appointed Monitor** ............................................ 546
  III.  **Collection of Data and the Elimination of the DMC** ................... 546

E.  MISCELLANEOUS ....................................................... 547
  I.  **Court Jurisdiction and Term of Agreement** .......................... 547
  II.  **Reaffirmation of Nondiscriminatory Identity, Practices and Procedures** ..................................................... 547
  III.  **Existing *Geier* Initiatives and Scholarship Program** ................ 547
  IV.  **Adoption of Provisions from the 1984 Stipulation of Settlement** ......... 548
  V.  **Access to Consultants Prior to Studies Being Conducted and Opportunity to Comment on Any Desegregation Impact Analyses** ............ 548
  VI.  **Attorneys' Fees and Expenses** ...................................... 549
  VII.  **Other Provisions** .................................................. 549

IT IS HEREBY AGREED TO by and among the undersigned, and subject to this Court's approval, that the State of Tennessee Defendants (the "State") shall implement in good faith the provisions of this Consent Decree:

## A.  INTRODUCTION

A.  Through extended negotiations spanning almost a year and with the help of a mediator, the parties have reached accord on and have memorialized a process that will lead to the elimination of the vestiges of Tennessee's prior *de jure* system of public higher education (hereinafter the "Agreement"). This Agreement requires that the Defendants take specific steps. It also sets forth procedures for further planning, assessment, and additional actions by the Defendants. This Agreement when fully implemented will create a system of public higher education that preserves and enhances access and educational opportunity for black and white students in Tennessee's public colleges and universities.

B.  In dismantling the vestiges of the former dual system, it is the parties' intention to create an educational system that enhances the increased enrollment of African American students at the predominantly white institutions and that likewise enhances the enrollment of white students at the State's predominantly black institution. To achieve this goal, the parties are committed to maintaining educational institutions that are committed to desegregation and to reaching out to all residents of this State regardless of race. It is also the intention of the parties that employment and promotion decisions within the State's system of higher education be made in an environment unfettered by the discriminatory practices of the old dual system. The goal is to increase the presence of other-race faculty, staff, and administrators on the campuses of the State's colleges and universities.

C.  The objective of this Agreement is to "eradicate policies and practices traceable to [the State's] prior *de jure* system [of public higher education] that continue to foster Segregation." *United States v. Fordice*, 505 U.S. 717, 728, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992). The parties are committed to reaching this objective in a timely and non-discriminatory manner and agree that with the implementation of all the provisions of this Agreement, the desegregation of all public institutions of higher education in Tennessee will be attained, and the vestiges of segregation eliminated.

D. The parties and their counsel further agree that the timely implementation of this Agreement will require all parties to act in a prompt and cooperative manner throughout the life of the Agreement. Accordingly, all parties and their counsel agree they shall (1) act in good faith, (2) seek to minimize expenses and costs whenever possible, (3) not withhold consent unreasonably, (4) conduct reviews and consultations promptly, and (5) exhaust all reasonable options before seeking intervention from the Court.

E. If the Tennessee General Assembly does not appropriate sufficient funds to comply with the fiscal terms of this Agreement, then this Agreement shall be considered no longer binding on the Plaintiffs and Plaintiff–Intervenors.

F. This Agreement is divided into three primary areas: (1) issues related to higher education in Middle Tennessee; (2), statewide issues affecting student enrollment, faculty and staff hiring, and promotion decisions; and (3) a plan for monitoring and assessing the effectiveness of this Agreement.[1]

## B. MIDDLE TENNESSEE

### I. Tennessee State University

A. *Establishment of the TSU Coordinating Committee*

1. The TSU President shall appoint a racially diverse committee (the "TSU Committee" or "Committee") composed of faculty, administrators, students (traditional and nontraditional), and Davidson County business leaders. In addition, the Chancellor of the TBR and the Executive Director of THEC shall each appoint one representative to the TSU Committee so that enhancement issues and budgetary concerns embodied in this Agreement can be assessed from the broadest possible perspectives. The Committee shall report directly to the President.

2. The Committee shall be responsible for coordinating and implementing the various obligations imposed on TSU under the terms of this Agreement and will have authority to call upon the various academic and administrative units within the University as needed. With the approval of the President, the TSU Committee can operate through subcommittees or task forces as may be necessary. The specific duties of the Committee are defined in the various sections of this Agreement.

B. *Administrative Enhancements*

1. Tennessee State University shall undertake to enhance the effectiveness and outreach of its Admissions Office, Financial Aid Office, and Registrar's Office. To achieve this objective, the University shall take the following steps:

a. Within forty-five (45) days after the appointment of the Monitor, the Monitor and the TSU President shall jointly select a nationally-recognized consulting firm that shall conduct a study of the University's admissions, financial aid, and regis-

1. The following acronyms are used throughout this Agreement: "APSU"—Austin Peay State University; "DA"—Doctorate of Arts; "DMC"—Desegregation Monitoring Committee; "ETSU"—East Tennessee State University; "MTSU"–Middle Tennessee State University; "NSL"—Nashville School of Law; "SREB" Southern Regional Educational Board; "TBR"—Tennessee Board of Regents; "THEC"—Tennessee Higher Education Commission; "TSU"—Tennessee State University; "TTU"—Tennessee Technological University; "UM"—University of Memphis; "UTC"—University of Tennessee Chattanooga; "UTK"—University of Tennessee Knoxville; "UTM"—University of Tennessee Martin; "UT"—University of Tennessee; "UTIA"—University of Tennessee Institute of Agriculture.

trar services. The purpose of the study is to assess these functions, to identify any policies or practices that may impede attainment of the Agreement's goals, and to recommend any administrative and structural changes in those offices and the programs they administer that will enhance the administrative efficiency and accessibility of TSU. The consulting firm should also study how to incorporate the administrative functions of the main campus with those to be established at the Williams Campus under this Agreement, and provide suggestions to the parties on how to assess the effectiveness of the changes to be implemented. The report and recommendation must include a proposed budget for any recommended changes or enhancements, as well as a timetable for implementation and a plan for post-implementation evaluation.

1. In preparing the report, the consulting firm should interview students, faculty, staff, administrators, and where appropriate, TBR officials. In conducting its study, the consulting firm must secure the views of traditional and nontraditional[2] students, of black and white students as well as a cross-section of the faculty. The consulting firm should also seek out individuals who applied, were admitted, but chose not to attend the University and individuals who had requested information about the University, or sought an application but chose not to apply.

2. The purpose of this study and any subsequent proposals is to assist the University in positioning itself to achieve its educational mission as a major state-supported urban and comprehensive university in part by creating an administrative and admissions process that is responsive to the needs of current students and applicants seeking admission to the University.

b. The consulting firm shall deliver its report and recommendations to the President of TSU for his review and assessment. The President's assessment of the consulting firm's report and recommendations, together with the firm's report, shall be sent to the Monitor and to the parties of record. The study shall be completed and the report of the consulting firm delivered to the Monitor and the parties within nine (9) months of the consulting firm's appointment. Upon receipt of the study, the parties shall have thirty (30) days to comment on the proposal to the Monitor.

1. After consulting with the Private Plaintiff, Plaintiff Intervenors, the University, and the TBR, the Monitor shall recommend those changes that in his or her judgment are educationally sound and practicable and appropriate in light of the obligations and objectives contained in this Agreement. The goal of the Monitor shall be to secure the parties' agreement on the steps to be taken and a timetable for implementation. If parties agree on a course of action and timetable, then the Monitor shall file with the Court the terms of that agreement and the State shall carry out the agreement.

2. If the parties are unable to agree, then the Monitor in his or her discretion can call upon nationally-recognized educational experts to review the issues and offer an

---

**2.** As used throughout this Agreement, the term "nontraditional students" means working adults generally over the age of 25. The terms "other-race" or "minority students" and "other-race or minority faculty" refer to white persons at TSU and black persons at the predominantly white institutions.

opinion. Thereafter, the parties with the help of the Monitor, will again consider a course of implementation. If they are unsuccessful, then the Monitor shall so inform the Court and shall file his or her recommendation with the Court.

C. *Recruitment of Other–Race and Nontraditional Students*

1. The President of TSU in consultation with the TSU Committee and Dean of Admissions and Records shall develop and implement a plan to recruit other-race and nontraditional students to TSU. The plan should include, as appropriate, using existing recruiting programs, including pre-university programs. The TSU Dean of Admissions and Records shall be provided with at least two recruiters, support staff, and the resources necessary to recruit other-race students to TSU. A focus of the plan must be on the recruitment of nontraditional students. As part of the plan, consideration shall be given to establishing programs that are specifically designed to introduce, or reintroduce, nontraditional age students to college. At least one of the recruiters' primary focus must be on nontraditional students planning to attend the Williams Campus.

   a. The TSU President or the Dean of Admissions and Records on behalf of the president shall submit the recruiting plan to the parties and the Monitor for review. After consulting with the Private Plaintiffs, Plaintiff Intervenors, the University, and the TBR, the Monitor shall recommend to the parties those portions of the plan that he or she believes should be adopted or modified. The goal of the Monitor shall be to secure the parties' agreement to the plan and to a timetable for implementation. If successful, then the Monitor shall file with the Court the terms of the plan and the University shall carry out the plan within the time specified.

   b. If the parties are unable to agree, then the Monitor in his or her discretion can call upon nationally-recognized educational experts to review the issues and offer an opinion. Thereafter, the parties, with the help of the Monitor, will again consider the matter. If they are unsuccessful, then the Monitor shall so inform the Court and shall file his or her recommendation with the Court.

D. *Institutional Public Relations*

1. The University, subject to the funding available in Paragraph (c) below, shall undertake a two-year intensive public relations campaign in the Nashville/Davidson County metropolitan area. The essential purpose of the campaign is to increase awareness about the University and its educational opportunities throughout the metropolitan population and particularly among that segment of the population that has not traditionally been aware of the opportunities available at TSU. The campaign shall emphasize the programmatic offerings for working adult students at the Williams Campus and available financial aid programs. The campaign must convey the image of TSU as a racially diverse institution dedicated to educational excellence and service to all segments of Middle Tennessee's population and its commitment to welcoming other-race students. The campaign shall begin once academic courses are available in significant number at nontraditional times and on weekends, and will feature prominently the University's commitment to diversity and to the education of nontraditional students.

   a. The TSU Committee shall coordinate and plan the advertising pro-

gram. The Committee shall seek the assistance of professionals with expertise in advertising and public relations within the Nashville metropolitan area and shall submit an advertising plan to the parties and Monitor in advance of initiating the campaign. The plan shall include the specifics of the campaign including identification of any private companies proposed to conduct or assist in the campaign, a time line for implementation of the plan, and a budget. The plan should be submitted to the parties and the Monitor at the same time the report on the enhancement of the Williams Campus is submitted.

b. The parties then shall have thirty (30) days to send their comments to the Monitor. Upon consideration of the plan and the comments of the parties, the Monitor shall approve the plan or propose modifications. Any proposed modifications shall be resubmitted to the parties for consideration.

c. The public relations campaign shall be funded jointly by the State and the University with the State responsible for 65% of the cost of the campaign. The State's total obligation for the campaign will depend on the amount contributed to the campaign by the University. The State's financial contribution to the campaign shall not exceed $400,000 over the two-year campaign period. The University's commitment to the campaign may include securing in-kind contributions such as the gratis services of a public relations firm, printing firm, production firm, etc. The University shall continue to advertise in Middle Tennessee even after this jointly funded campaign is concluded.

1. TSU and TBR officials shall certify the amount of institutional funding or in-kind contributions. The State shall use existing procedures, or design a procedure, for verification of the amounts.

E. *Establishment of a College of Public Service and Urban Affairs and Program Exclusivity*

1. If TSU can meet the ordinary procedures and policies of the TBR and THEC regarding the creation of a new College of Public Service and Urban Affairs, then TSU may establish such a college provided, however, that it should delay petitioning the TBR until after the enhancements at the Williams Campus are planned and underway.

a. The purpose of such a college would be to consolidate existing programs and academic departments within a coherent administrative structure augmented from time to time by new programs where the requisite demonstration of need can be established and the requirement of start-up resources met by the University.

b. The University shall be responsible through its own resources for the start-up costs associated with the establishing of a College of Public Service and Urban Affairs. The college shall be organized in a manner consistent with other existing colleges at the University.

2. TSU shall maintain its current exclusivity in Middle Tennessee for all current academic programs in which it now enjoys exclusivity unless there is a demonstrated need for duplication and such duplication will not adversely affect the desegregation of TSU.

F. *The Endowment for Educational Excellence*

1. The parties agree to the creation of a State and University partnership to establish the TSU Endowment for

Educational Excellence ("Endowment").

a. The State shall contribute one million dollars annually for ten years to the TSU Endowment. For the first ten years of the Endowment, the State shall also match, dollar for dollar, any privately raised gifts by the University up to an additional $10 million. The State, however, shall never be required to pay more than $1.5 million in matching funds in any given year. If private donations to the Endowment exceed $1.5 million in any given year, the excess shall be carried forward to the next year and applied toward the match for that year. If private donations are less than one million in any given year, the State will match the amount actually raised. At the end of the ten year period, and assuming the University can secure the full match, the TSU Endowment will have a corpus in excess of $30 million.

b. At least 25% of the annual income from the Endowment must be reinvested in the Endowment's corpus.

c. The Endowment income not annually reinvested in the corpus must be used for educational purposes at Tennessee State University. Those purposes include merit-based scholarships, faculty development, research grants and support, Chairs of Excellence and Centers of Excellence, support of lectures and lecture series on the campus by nationally known authorities. The earnings from the Endowment can also be used for the enhancement and expansion of library holdings and services including enhancing access to electronic library services. Endowment income may also be spent on management fees associated with the management of the Endowment.

d. Income from the Endowment can never be used to construct buildings or to maintain facilities, nor can Endowment income be used for student athletic scholarships or to support the University's athletic program. Endowment income cannot be used to pay compensation to any trustees of the Endowment and Endowment principal cannot be spent without the consent of the Court.

e. Of the Endowment income to be annually devoted to merit-based scholarships, no more than one-third of such aid may be awarded to out-of-state students. The sole criterion for awarding Endowment scholarships shall be merit. Endowment scholarships shall not be limited to full-time or residential students. Of the Endowment income to be annually devoted to funding faculty research grant proposals, the University shall review the proposals and disburse funds pursuant to normal and currently established procedures including procedures for involving faculty.

f. TSU and TBR officials shall certify to the State the amount of annual private giving to the Endowment. The State shall use existing procedures, or design a procedure, for verification of the amounts.

2. The TSU Endowment shall begin one year after the Court approves this Agreement. The one-year period following approval of this Agreement is to be used by the University to prepare appropriate legal documents and to secure such tax exemptions as may be appropriate. The year shall also be used by the University to devise a plan for effective fund raising. The documents formally establishing the Endowment and the management thereof shall be submitted to the parties and the Monitor for review prior

to execution by the trustees of the Endowment.

### G. Facilities Review

1. Within ninety (90) days of the approval of this Agreement, The United States, at its own expense, shall employ a facilities consultant to examine whether in the judgment of the consultant and The United States the vestiges of segregation concerning the facilities on the TSU main campus have been removed to the extent practicable and consistent with sound educational practices.

2. The United States' facilities consultant will conduct on-site visits at MTSU, TSU and UM. In advance of those visits, the consultant will require documentation regarding facilities at selected institutions and the investment of state money in university physical plants. Accordingly, within one hundred twenty (120) days of the approval of this Agreement, the State shall make available (in narrative form or for inspection and copying, as appropriate) to the United States and the private plaintiffs those documents that are reasonably necessary to enable the United States to make the planned assessment. The United States and the State shall, within sixty (60) days of the approval of this Agreement, confer and agree upon those documents within the State's possession, custody or control that are to be made available to the United States and private plaintiffs.

3. Within one hundred eighty (180) days of the approval of this Agreement and on mutually agreeable dates, the State shall provide The United States and its consultant with reasonable access to the facilities, buildings and grounds at TSU, MTSU, and UM so that site visits may be conducted at each campus.

4. The United States agrees to provide the State, the other parties, and the Monitor a copy of the consultant's report and recommendations.

5. The State shall review the consultant's report and recommendations and shall respond within ninety (90) days of receipt of the report. Any other party wishing to respond to the consultant's report may do so within the same time permitted the State. All responses shall be served upon the parties and the Monitor. Thereafter, if the State and The United States or any other party are unable to agree whether the current facilities on the TSU main campus are a vestige of segregation that requires remediation or what action if any should be taken, then they may take up the matter with the Court.

### H. Community Service and Outreach

1. The parties agree that for TSU to fulfill its mission as the major state-supported urban and comprehensive university in Middle Tennessee, it must establish partnerships with the Middle Tennessee business community.

   a. To encourage and strengthen these mutually beneficial partnerships, TSU must reach out to the broadest possible business constituency. To focus these relationships, the President of TSU, working through the TSU Committee, shall conduct a review and assessment of the University's current strengths in this area and prepare recommendations on how the University might enhance its business outreach.

   b. The President shall issue his report to the parties and to the Monitor within one hundred eighty (180) days after this Agreement is approved. The report shall include a description of how the University currently conducts its outreach operations and how the University can enhance them. The Monitor shall

periodically review the implementation of the recommendations.

*I. Minimum First–Time Freshman Admission Standards and Retention*

1. The parties agree that over a three-year period, TSU shall raise its current minimum first-time freshman admission standards consistent with the provisions of paragraph (I)(1)(d) below. In making these changes it is further agreed as follows:

   a. Within sixty (60) days of the appointment of the Monitor, there shall be a meeting among counsel, appropriate University and TBR officials, and the Monitor, to agree upon the data that needs to be collected and reviewed in order to evaluate the effect of any proposed changes. In addition to agreeing on the data to be collected and reviewed, the participants shall also agree on a timetable for the University to make a recommendation report to the parties and the Monitor.

   b. Thereafter, in accordance with the timetable agreed to, the University shall review the data and make its recommendations regarding changes to the minimum first-time freshman admission standards.

   c. As part of its review process, and prior to making its recommendations, TSU shall evaluate the likely effect of any proposed changes in admission standards on the admission of traditional and non-traditional first-time freshman by race. In recommending changes in admission criteria, the University must recommend those changes that are educationally sound and may not recommend admission standards that have an unacceptable detrimental effect on access for first-time freshmen wishing to attend TSU.

   d. In determining what would be an "unacceptably detrimental effect on access," the parties agree that no change in admission standards shall be approved that in any one year, when fully implemented, would operate to exclude from admission more than five (5) percent of the first-time freshman class enrolled in the University, at the time the proposal for increasing admission standards is presented to the parties for consideration. In calculating this number, the University shall not include those freshmen admitted under an alternative standard. To ameliorate the effect on access of any increases in minimum first-time freshmen admission standards on traditional and nontraditional students, the University may increase its use of alternative standards.

   e. The recommendations of the University, together with supporting data, shall be provided to the parties and the Monitor. The parties and the Monitor shall review the recommendations and if accepted, the University shall implement them.

   f. If the parties are unable to agree with the University's recommendations, then the Monitor in his or her discretion can call upon nationally-recognized educational experts to review the issues and offer an opinion. Thereafter, the parties with the help of the Monitor will again consider the matter. If they are unsuccessful in reaching agreement, then the Monitor shall so inform the Court and shall file his or her recommendation with the Court.

2. At the end of the three-year phase in period for new admission standards required by paragraph (I)(1) above, the University shall review the effect of those standards on enrollment and access. After the review, the University shall make a recommendation on

whether the admission standards should be adjusted. The determination of what action to take, if any, shall be based, in part, on enrollment trends since the date of the Court's approval of this Agreement. If admission standards are to be increased after the third-year review, they must be increased in a fashion that is educationally sound and the increase may not have an unacceptably detrimental effect on access for first-time freshmen wishing to attend TSU.

a. If the University decides to increase its minimum first-time freshmen admission standards after the review called for in this paragraph, it may do so over a three-year period of time. In determining what would be an "unacceptably detrimental effect on access," the parties agree that any increase in admission requirements may not exceed a point which would exclude more than five (5) percent of the first-time freshman class enrolled in the University at the time the proposal for a second increase in admission standards is presented to the parties for consideration. In calculating this number, the University shall not include those freshmen admitted under an alternative standard. To ameliorate the effect on access of any increases in minimum first-time freshmen admission standards on traditional and nontraditional students, the University may increase its use of alternative standards.

b. The University shall report to the parties and the Monitor, the results of its assessment, and its recommendation regarding admission standards. The parties and the Monitor shall review the recommendations and if accepted, the University shall implement them.

c. If the parties are unable to agree with the University's recommenda-

tions, then the Monitor in his or her discretion can call upon nationally-recognized educational experts to review the issues and offer an opinion. Thereafter, the parties with the help of the Monitor will again consider the matter. If they are unsuccessful in reaching agreement, then the Monitor shall so inform the Court and shall file his or her recommendation with the Court.

3. The parties also agree that TSU shall assess its post-admission support and retention programs aimed at achieving higher rates of student persistence to graduation in the same fashion as other institutions are directed to do so under the requirements of this Agreement. In making this assessment it is further agreed as follows:

a. Within sixty (60) days of the appointment of the Monitor, there shall be a meeting among counsel, appropriate University and TBR officials, and the Monitor, to agree upon the data that needs to be collected and reviewed in order to evaluate the effect of any proposed changes. In addition to agreeing on the data to be collected and reviewed, the participants shall also agree on a timetable for the University to make a recommendation.

b. Thereafter, within the agreed time, the University shall review the data and make its recommendation regarding changes, if any, to its retention programs

c. The recommendation of the University, together with supporting data, shall be provided to the parties and the Monitor. The parties and the Monitor shall review these recommendations and if accepted, the University shall implement them.

d. If the parties are unable to agree with the University's recommendation, then the Monitor in his or her

discretion can call upon nationally-recognized educational experts to review the issues and offer an opinion. Thereafter, the parties with the help of the Monitor will again consider the matter. If they are unsuccessful in reaching agreement, then the Monitor shall so inform the court and shall file his or her recommendation with the Court.

J. *Revitalization of the Downtown Williams Campus and Outreach to Nontraditional Students*

1. The parties agree that the revitalization of TSU's Williams Campus so that it becomes a place for focused academic programming directed toward nontraditional undergraduate and graduate students is necessary to achieving the goals of this Agreement. To reach this goal the parties are committed to the creation of a dynamic educational environment on the Williams Campus for working adult students. This is to be accomplished by:

a. Providing classes at nontraditional hours, weekends, and during summer term.

b. Providing courses at the Williams Campus with the understanding that there must be programmatic integration with the main campus in terms of faculty and facility usage. The objective is to enable students to secure disciplinary degrees at hours attractive to nontraditional students to the fullest extent practicable using the resources of both the Williams Campus and the main campus.

c. The programs offered by TSU at its Williams Campus facility must meet the needs of nontraditional students and students from the business community, be consistent with the objectives of this Agreement and be in furtherance of TSU's mission.

d. Appropriate institutional services at the Williams Campus shall be available at hours and on days convenient to nontraditional students. TSU shall make available at the Williams Campus during the evening and on weekends while classes are in session institutional services including registration, recruitment, admissions, financial aid, registrar, bookstore, library and computer services.

e. The State shall provide the capital finding necessary to renovate the Williams Campus in order to meet programmatic, administrative, and student needs.

f. The State shall create a new five-year $750,000 a year scholarship program at TSU exclusively for residents living within the Nashville Statistical Metropolitan Area who attend evening, and weekend classes at TSU. These funds would be available to support nontraditional full-time or part-time baccalaureate or graduate degree-seeking students (other than law school students) who enroll in TSU's evening and weekend curriculum. This scholarship program shall begin once the revitalization of the Williams Campus is underway and additional evening and weekend class offerings are available.

1. TSU officials shall annually certify to the TBR in a manner prescribed by the TBR that all recipients of this aid program meet the requirements set out herein.

2. Because the University's outreach to nontraditional students will span academic disciplines and involve a range of administrative services, it is essential to create an administrative unit that can coordinate and oversee the University's activities in this regard. The aim is to create an administrative unit at the highest level of the University that will give academic status and

institutional credence to TSU's programming for nontraditional students. In order to achieve this goal, the parties agree as follows:

a. Working with the TBR, TSU shall create a new administrative unit to coordinate TSU's educational outreach to nontraditional students. This unit shall be administered by an Associate Vice President or Dean, whichever is appropriate, and report to the Chief Academic Officer. The position would be one for the management of nontraditional education and outreach. This person will be responsible for coordinating with other academic and administrative units of the University to ensure that TSU's educational programing to nontraditional students is focused and comprehensive.

b. This position shall be filled from a national search consistent with the requirements for hiring set forth in this Agreement and completed as quickly as practicable.

3. The academic and administrative changes required to expand the opportunities for nontraditional students attending TSU will require study and implementation. To implement these changes in an educationally sound and practicable manner, the parties agree to the following:

a. The TSU Committee shall plan for, and report on, the enhancement of the Williams Campus and the University's expanded focus on nontraditional students.

b. The report of the TSU committee shall include, among other things, a description of the courses and administrative services to be offered at the Williams Campus as well as the faculty requirements. The report shall also provide a description of any renovations to the Williams Campus that may be necessary. Furthermore, the report shall describe the administrative structure the University proposes to use to coordinate and administer its educational outreach to nontraditional students including any existing programs directed at nontraditional students. Finally, the committee's report shall include a timetable for implementation as well as a proposed budget. The committee will make every effort to issue its report within one year of the Court's approval of this Agreement.

1. The report of the committee shall be submitted to the parties and the Monitor for review and assessment. After consulting with the Private Plaintiffs, Plaintiff Intervenors, the University, the TBR, and THEC, the Monitor shall recommend to the parties those enhancements that are consistent with the obligations and objectives of this Agreement. The goal of the Monitor shall be to secure the parties' agreement on the steps to be taken and to agree to a timetable for implementation. If parties agree on a course of action and timetable, then the Monitor shall file with the Court the terms of that agreement and the State shall carry out the agreement within the time specified.

2. If the parties are unable to agree, then the Monitor in his or her discretion can call upon nationally-recognized educational experts to review the issues and offer an opinion. Thereafter, the parties, with the help of the Monitor, will again consider a course of implementation. If they are unsuccessful, then the Monitor shall so inform the Court and shall file his or her recommendation with the Court.

K. *Establishment of a Public Law School at TSU*

1. During the term of this Agreement, if a public law school is established in

Middle Tennessee, it must be established at TSU.

2. Under this Agreement, TSU will enter into negotiations with The Nashville School of Law ("NSL"). The parties agree that the State is not obligated to secure the agreement of the NSL to merge with TSU. Merger negotiations must be concluded within one year of the approval of this Agreement. If negotiations are satisfactorily concluded and the NSL agrees to merge with the University, then the parties agree as follows:

a. It is anticipated that the law school will be established on the Williams Campus. If, however, this space does not meet the American Bar Association accreditation requirements, then the TBR will locate the law school in another downtown Nashville location with funds provided by the State if necessary.

b. The law school is to be established in such a way as to secure ABA accreditation. The State cannot guarantee accreditation, but it will make every reasonable effort to assist the University in securing accreditation within the terms and financial limits set out by this Agreement.

c. The State shall provide the University funding to support the law school in its start-up phase in the following amounts: $10 million in capital funding and $5 million in start-up funding. In addition, the State shall match one dollar for every one-and-a-half dollars raised by the NSL or the University which they dedicate to covering start-up cost for the law school. The State's total obligation for matching funds under this provision shall not exceed $2 million.

1. TSU and TBR officials shall certify to the State the amount of any privately raised funds for the law school to which the match is to

apply. The State shall use existing procedures, or design a procedure, for verification of the amounts.

3. No public law school may be started at TSU without first meeting the program approval requirements of the TBR and THEC.

4. In the event negotiations with the NSL do not lead to a merger agreement, the State shall provide up to $5 million in start-up funding for the following programs and college at TSU:

a. A new high-demand doctoral degree program in an area where there is demonstrated need and that is consistent with the mission of TSU and the objectives of this Agreement.

b. The start-up cost associated with establishing a College of Public Service and Urban Affairs and one new program to be included therein.

c. Consistent with the requirements that the Williams Campus be enhanced in a fashion to attract nontraditional students, TSU may propose up to two new baccalaureate or masters programs for inclusion in the curriculum of the Williams Campus. Both programs should build on existing faculty and institutional resources and be in high demand areas that will attract and meet the needs of nontraditional students.

d. All new programs proposed under this alternative must be submitted to the TBR and THEC, and TBR and THEC approval must be secured. In assessing the University's proposal, TBR and THEC shall apply their usual and customary procedures. TSU shall have programmatic exclusivity within Middle Tennessee with respect to new programs initiated at the Williams Campus pursuant to this provision. Such programming must also be non-duplicative of any existing pro-

grams at public universities in Middle Tennessee.

5. The parties agree that the revitalization of the Williams Campus as contemplated in this Agreement and the possible establishment of a law school are of significant importance. The TSU Committee shall recommend means to minimize disruption to the ongoing educational services now being provided at the Williams Campus that might accompany the campus's revitalization and possible establishment of a law school.

## II. The Proposed Davidson County Community College

A. *Establishment of the Proposed Community College or Technical Community College in Davidson Country*

1. The decision of whether to establish a community college in Davidson County shall be made pursuant to sound educational policy and applicable statutory requirements through the ordinary and normal processes used by the State to make such decisions including the required desegregation impact analysis.

2. A community college in Davidson County, if any, shall not be subsumed within an existing university nor become a branch of an existing university.

B. *Relationship Between the Proposed Community College or Technical Community College and Tennessee State University*

1. If the State determines that a community college is needed in Davidson County, then TSU and any such community college shall have articulation and transfer agreements. Additionally, as part of any proposal for the establishment of a community college in Davidson County, the TBR must require and implement strong and sustainable linkages between the proposed community college and TSU. These linkages must be in addition to articulation and transfer agreements and shall be clearly set out prior to formally establishing a community college. These linkages, for example, could include utilizing TSU faculty and facilities both at the Williams Campus and on the main campus.

2. If the State determines that a community college is needed in Davidson County, then the relationship between that community college and TSU shall be established in such a way as to encourage enrollment from the two-year degree program directly into TSU's baccalaureate program. To that end, the parties agree that during the term of this Agreement, if a community college is established in Davidson County, then for a period of five years thereafter, any student who is a resident of Tennessee as defined by TBR policy, and who graduates from the newly established Davidson County community college, shall be permitted to enroll in TSU's baccalaureate program at the same tuition rate then being paid at the community college. No more than 350 students shall be enrolled at TSU under this tuition reduction program at any one time. Student participation in the program shall be limited to no more than five consecutive semesters counting from the first semester when the student enrolls at TSU, or graduation whichever comes first. The difference in tuition payments between the community college and the TSU rates for students enrolled under this program shall be made up by the State.

## III. Middle Tennessee State University

A. MTSU is permitted to seek the conversion of some or all its existing DA programs to Ph.D. programs provided they are noncompetitive and non-duplicative of TSU's existing doctoral programs. The conversion of some or

all of MTSU's DAs to Ph.D.s is to be done consistent with the University's academic mission, meet a demonstrated need and comply with TBR requirements. The proposed conversions must be done pursuant to TBR and THEC policies, and TBR and THEC approval must be secured.

B. Subject to the requirements of Paragraph (III)(A), the parties further agree that MTSU shall convert no more than three of its DAs to Ph.D.s during the first two years of this Agreement. Thereafter, any remaining DAs that are appropriate for conversion to the Ph.D. may be converted upon approval by the TBR and THEC. During the term of this Agreement, the number of Ph.D. programs at MTSU shall not exceed the number at TSU.

C. For the term of this Agreement, MTSU may not offer courses for credit at any physical location in Davidson County.

### IV. Relationship Between Middle Tennessee Institutions

A. MTSU, TSU and APSU shall form a committee to establish coordinated academic calendars that enable cross registration agreements and transfer agreements between the cooperating universities. These calendars shall be intended to facilitate the enrollment of students taking courses during the same enrollment period at one or more of these institutions. Every effort must be made to secure common registration periods, dates for the start and end of classes, final exam periods and vacation and holiday periods. The transfer agreements are to be instituted pursuant to the requirements of Tenn.Code Ann. § 49–7–202(d)–(e). These agreements and coordinated calendars shall be in place no later than the start of Academic Year 2002–03. If the State establishes a community college in David-son County, that community college shall also participate in the coordinated academic calendars.

1. In order to plan for the establishment of coordinated calendars and the other requirements of this provision, the chief academic officers of the three institutions and the chief academic officer of the TBR shall meet within forty-five (45) days after approval by the Court of this Agreement. The group will constitute a committee whose charge is the preparation of a proposal for the implementation of this provision. The committee will be chaired by the TBR official. Once the work of the committee is complete, the proposal shall be submitted to the Board of Regents for review and approval, and to the parties and Monitor for review.

### V. New Program Development, Program Termination and Program Exclusivity in Middle Tennessee

A. Future academic program approval and termination decisions in Middle Tennessee shall be guided by the ordinary procedures of the TBR and THEC and by the terms of this Agreement and be consistent with the TBR's plan for programming in Middle Tennessee.

1. In the exercise of these procedures, the TBR and THEC shall require of any new program proposal that an assessment of the program's potential impact on the desegregation of Middle Tennessee institutions (universities and two-year schools) be made and that no negative effect be discernible. Program approvals must be consistent with an institution's mission and not infringe or diminish the educational mission of any other institution.

2. The TBR and THEC shall disclose to the parties those requirements it intends to put in place to

ensure that a desegregation impact analysis is performed.

B. Copies of all Letters of Intent to propose new academic programs received at the TBR from APSU, MTSU, and TSU, shall be provided to counsel of record for the term of this Agreement. This provision shall apply only to those Letters of Intent received after the date the Court approves this Agreement.

C. TSU shall maintain its current exclusivity in Middle Tennessee for all programs in which it now enjoys exclusivity unless there is a demonstrated need for duplication and a showing that such duplication will not adversely affect the desegregation of TSU. The decision of whether duplication is necessary shall be made by the TBR and THEC. The exclusive academic programs at TSU can be determined by reference to THEC's Academic Program Inventory.

## C. STATEWIDE ISSUES

### I. Faculty and Administrative Hiring and Retention[3]

*A. UT and TBR Committees on Faculty and Administrative Hiring*

1. The parties agree to the establishment of two statewide committees on faculty and administrative hiring. One committee is to be chaired by the TBR Chancellor and the other to be chaired by the UT System President. The two committees have identical charges, with the TBR committee focusing on TBR institutions, and the UT committee focusing on UT institutions.

2. Except as specified in Paragraph A(1)(d)(3), the committees shall operate independently. Each committee will examine its institutions' current practices with respect to the hiring and retention of African–American faculty and administrators. The com-

mittees will also examine how existing *Geier* programs for recruitment and retention of other-race faculty and administrators are being utilized, and whether changes in those programs could enhance the employment and promotion opportunities for other-race faculty and administrators. The committees will examine examples of "best practices" underway at other universities throughout the country, and how current affirmative action guidelines and policies are applied.

3. The goal of the committees is to propose innovative ways to utilize institutional resources to enhance and further the recruitment and retention of African–American faculty and administrators.

4. The following shall govern the creation of the committees and the carrying out of their charges:

a. Membership on the committees is to be drawn from faculty, administrators, students, business leaders and prominent citizens within the State. The membership and size of the respective committees is to be decided by the UT President and the TBR Chancellor but shall be at least fifteen members. The two committees must reflect the various institutions they represent and strive to be at least 45% African American. The committees shall be established within forty-five (45) days of the Court's approval of this Agreement.

b. The UT President and the TBR Chancellor can appoint vice-chairs to oversee the day-to-day responsibilities of administering the committees. However, the chairs must actively participate in the work of the committees as their schedules permit.

c. Within ninety (90) days after the appointment of the Monitor, the

---

**3.** These proposals apply to TBR institutions other than TSU unless otherwise noted.

Monitor and the committees shall jointly select a nationally-recognized expert or consultant in the hiring and retention of African–American faculty and administrators. The consultant will assist the committees determining the best practices now underway across the country. To save costs, the committees can act jointly in hiring a consultant and receiving the consultant's report.

d. The committees will study the feasibility of providing incentive funding to academic departments who successfully recruit and retain African–American faculty. The incentive program could take the form of additional departmental operating funds, travel funds, equipment funds, etc., subject to renewal as long as the department retains and promotes African–American faculty.

e. The committees will also study whether the current procedures for granting tenure have any negative affect on African–American faculty seeking tenure and promotion. The committees will also assess whether there is an inappropriate disparity in salary levels between black and white faculty and administrators that discourages employment and retention of black faculty and administrators. If such studies have already been conducted, they shall be reviewed to ensure that the conclusions reached are still valid.

f. The committees shall prepare individual reports that include an assessment of current practices and any proposed changes and enhancements to those practices. The reports shall include a proposed budget for any new initiatives and a timetable for implementation. The committees shall provide the reports to the parties and the Monitor and shall submit them within one year following approval by the Court of this Agreement.

1. After consulting with the Private Plaintiffs, Plaintiff Intervenors, the TBR, and the UT System, the Monitor shall recommend to the parties the enhancements and initiatives that in the judgment of the Monitor are educationally sound and practicable and appropriate in light of the obligations and objectives contained in this Agreement. The goal of the Monitor shall be to secure the parties' agreement on the steps to be taken and to agree to a timetable for implementation. If parties agree on a course of action and timetable, then the Monitor shall file with the Court the terms of that agreement and the State shall carry out the agreement.

2. If the parties are unable to agree, then the Monitor in his or her discretion can call upon nationally-recognized educational experts to review the issues and offer an opinion. Thereafter, the parties, with the help of the Monitor, will again consider a course of implementation. If they are unsuccessful, then the Monitor shall so inform the Court and shall file his or her recommendation with the Court.

B. *Specific Actions in Addition to the Recommendations of the Committees*

1. For a period of five years, State funds shall be made available to UTK, UM, and MTSU in the event it offers Ph.D.s, to establish a pre-doctoral fellowship program to recruit and support other-race graduate students from across the country who are completing dissertation research. The fellows must be currently enrolled in universities other than the university awarding the fellowship. This fellowship program is intended to be a recruitment tool by bringing to Tennessee universities soon-to-be Ph.D.s who would then have the opportunity to

develop professional relationships within departments interested in possibly recruiting fellows to tenure track positions. Criteria for participating in the fellowship program shall be set by each institution.

2. For a period of five years, State funds are to be made available to the predominately white institutions to recruit established and respected African American scholars as visiting professors. This program's objective will be to increase awareness among African–American scholars across the country of Tennessee's universities and the employment and professional opportunities that exist in the State for their doctoral students.

3. One of the sources from which the State's predominately white universities can identify African–American candidates for new or vacant faculty positions is the SREB's Minority Doctoral Scholars Program.

4. In preparing their recommendations, the committees shall incorporate the points contained in this section.

C. *Employment Search Practices Within the TBR and UT Systems*[4]

1. The parties agree that employment decisions of every institution within the TBR and UT systems must be open, fair, and competitive.

2. Both the TBR and the UT systems have federally required affirmative action guidelines and hiring policies. In addition to these established requirements, the parties agree that with respect to all positions to be filled from a search—whether faculty at any rank or administrative—the following obligations shall apply:

   a. Every effort must be made to secure diversity in the composition of the faculty and administrative search committees unless it is impractical to. do so. In those in-

stances where a committee is formed to search for a University or college administrator at the level of dean or higher, the search committee must be racially diverse.

   b. Any candidate for hire must first be screened by the search committee before an offer of employment can be extended.

   c. In addition to publishing notices of job openings in journals of general circulation such as *The Chronicle of Higher Education or Black Issues in Higher Education*, the institutions, where appropriate, shall also publish notices of job openings in discipline-specific journals.

   d. At the time the search committee submits the list of candidates to fill a position to the hiring authority, each candidate shall meet or exceed the criteria published in the job description, and the chair of the search committee shall so certify.

3. The EEO officer of each institution prior to a final offer of employment being extended shall certify to the staffs of the respective boards that the requirements of this section have been met.

4. The TBR and the UT system administrations must approve or disapprove, prior to any offer of employment being extended, the recommended choice of the campus appointing authority for any academic administrative position at the department chair (or head) level and above at each of its institutions. The review required by this Agreement shall be limited to a determination of whether the factors listed above in section 3(b)(1–4) have been complied with. Upon receiving a request to make an offer, the TBR and UT system administrations shall promptly provide the Monitor with a certification that the search has complied with section 3(b)(1–4). The

---

4. This provision shall apply to TSU.

Monitor shall have three days following receipt of the certification to raise any questions regarding compliance with the terms of the Agreement. If no issues are raised within the three-day period, then the offer of employment may be made immediately upon compliance by the institution with all other pre-employment policies of the TBR and UT systems. The Monitor's sole task shall be to confirm compliance with the terms listed above in section 3(b)(1–4). The Monitor's review shall not include making a judgment on whether the candidate to be hired meets or exceeds the criteria published in the job description.

5. Nothing in this Agreement is intended to reserve any administrative or academic position at any UT or TBR institution for an individual of a certain race or ethnicity.

6. The parties agree that in designing the annual reporting called for by this Agreement, they shall devise a method for monitoring compliance with these provisions.

7. It is understood and agreed that while employment issues have been addressed in some measure' in this litigation, individual complaints of discrimination have not. Consequently, a subsequent finding that the State's system of higher education is unitary in the area of faculty, administrative, and staff employment, shall not operate to preclude an individual complaint of employment discrimination, any admissible evidence in support of or in opposition thereto, or the granting or denial of relief therefrom.

## II. Other–Race Undergraduate Student Recruitment and Retention Within the UT System

### A. *UT System Study of Minority Recruitment*

1. The Directors of Undergraduate Admissions at UTK, UTC, and UTM together with their staffs and appropriate university and System officials shall individually at the institutional level and collectively at the System level, study currently implemented strategies for the recruitment of other-race high school students and other-race community college students. The objective of the study is to assess current practices and to propose enhancements to those practices. The study will also evaluate the effectiveness of the current *Geier* programs and make "best practice" recommendations on whether those programs should be enhanced, modified, replaced, or terminated.

2. In assessing its current practices and proposing new initiatives, the UT institutions are to be mindful of the following points:

a. One of the most important determinants for the majority of student enrollment decisions is the receipt of financial aid.

b. An open, welcoming campus climate is an important determinant of other-race student enrollment decisions.

c. The utilization of pre-college and pre-university summer programs as a means of attracting potential students is a powerful device and recognizes that the recruitment of minority students must begin early in a student's high school years.

d. The establishment of strong linkages in minority student communities (churches, schools, etc.) enhances the visibility of the university and furthers awareness of the educational opportunities available.

e. Increased use of alternative admission standards as a means of admitting students who do not meet the minimum regular admission requirements, but show potential for successful college work.

3. Once the studies required above are concluded, the System shall prepare a report in which it provides an assessment of its current recruitment practices and any proposed enhancements and changes to those practices. This report can be prepared in conjunction with the work of the Noel–Levitz consulting firm [5] if the System determines that it is appropriate.

4. The UT System has previously contracted with Noel–Levitz to conduct an assessment of its recruiting markets and recruiting practices. As part of this contract, the UT System will request the Noel–Levitz firm to undertake an assessment of the techniques for successfully recruiting transfer students from the state's community college system. The UT System shall use the techniques it acquires from the Noel–Levitz assessment to assist in recruiting transfer students from community colleges with significant African–American student populations.

5. Following receipt of the Noel–Levitz report and recommendations and its own self-studies, the UT System shall report to the parties and the Monitor the specific steps it plans to take to enhance and sustain African–American undergraduate recruitment. The System's report shall include a proposed budget for new initiatives as well as a timetable for implementation. The System shall submit the report within one year of the approval by the Court of this Agreement.

6. After consulting with the Private Plaintiffs, Plaintiff Intervenors, and the UT System, the Monitor shall recommend to the parties the enhancements and initiatives that in the judgment of the Monitor are educationally sound and practicable and appropriate in light of the obligations and objectives contained in this Agreement.

The goal of the Monitor shall be to secure the parties' agreement on the steps to be taken and to agree to a timetable for implementation. If parties agree on a course of action and timetable, then the Monitor shall file with the Court the terms of that agreement and the State shall carry out the agreement.

7. If the parties are unable to agree, then the Monitor in his or her discretion can call upon nationally-recognized educational experts to review the issues and offer an opinion. Thereafter, the parties, with the help of the Monitor, will again consider a course of implementation. If they are unsuccessful, then the Monitor shall so inform the Court and shall file his or her recommendation with the Court.

B. *Specific Actions in Addition to the Committee's Recommendations*

1. In addition to the initiatives that will flow from the self-study, the following specific requirements are agreed to and shall be incorporated in the recommendations to be prepared by the UT System.

   a. UTK Recruiters in Nashville and Memphis

      1. UTK presently employs one full-time recruiter in Nashville and another in Memphis. For the term of this Agreement, UTK shall continue to maintain full-time recruiter positions in each of these cities. These recruiters shall devote significant effort and resources to the recruitment of African–American students.

      2. The Nashville and Memphis recruiters shall each be supported by at least one full-time support staff person.

---

**5.** Noel–Levitz is a national recognized consulting firm with expertise in a number of areas related to student recruitment, retention, and enrollment.

3. The Nashville and Memphis recruiting offices shall each be housed in adequate facilities and located in accessible locations.

b. Pre–University Programs

1. The State for a period of five years shall provide financial support for the establishment of a summer pre-university enrichment program for rising African–American high school freshmen, sophomores and juniors. Students would be selected on the basis of academic aptitude and recommendations. Criteria for participation shall be set by the System. The program's academic focus shall be on popular undergraduate programs.

2. The program shall be designed to accommodate 250 students a year.

3. The students shall participate in a one- or two-week session. The students will live on campus, attend classes taught by university personnel, and generally experience college life. The System shall devise the structure of the program and will report to the parties and the Monitor in its report. The objective of the program is to expose students to collegiate life and provide an opportunity to recognize the benefits of a college education.

4. In designing the program, the System may choose either to require all the participating students to be on one campus and then rotate the program every year among the System's institutions, or it could decide to divide the students equally among the participating universities every year.

c. Additional Other–Race Financial Aid

1. The State agrees to form a partnership with the UT System to increase the availability of financial aid for other-race students attending UT institutions.

2. For a period of five years, the State and the UT System will jointly participate in making funding available to support minority financial aid programs. These funds shall be in addition to any existing *Geier* other-race scholarship programs as well as any other scholarship programs currently underway that are directed toward undergraduate minority students. This funding can be used to increase the size of existing scholarship programs or to establish wholly new programs. Such funds may not be used for athletic scholarships.

3. The State shall cover 40% of the cost of the scholarship program. The amount of the State contribution shall depend on the amount of funding contributed to the program by UT institutions. The State's total financial commitment shall not, however, exceed $450,000 a year for five years. If UT secures the full State match, an additional $1.125 million would be available for other-race undergraduate financial aid programs.

4. UT officials shall certify the amount of institutional funding contributed to the program. The State shall use existing procedures, or design a procedure, for verification of the amounts.

5. The UT System shall devise a method for distributing the proceeds of the program among its institutions.

## III. Other–Race Undergraduate Student Recruitment and Retention Within the TBR System

A. *TBR Study of Minority Recruitment*[6]

1. The Directors of Undergraduate Admissions at APSU, ETSU, MTSU,

6. These proposals apply to TBR institutions other then TSU unless otherwise noted.

TTU and UM together with their staffs and appropriate university and System officials shall individually at the institutional level and collectively at the System level, study currently implemented strategies for the recruitment of other-race high school students and other-race community college students. The objective of the study is to assess the effectiveness of current practices and to propose enhancements to those practices. The study shall also evaluate the effectiveness of the current *Geier* programs and make "best practice" recommendations on how those programs should be enhanced, modified, replaced, or terminated.

2. A similar study will be undertaken by the TBR on behalf of its community colleges.

3. In assessing its current practices and proposing new initiatives, the TBR institutions shall be mindful of the following points:

   a. One of the most important determinants for the majority of student enrollment decisions is the receipt of financial aid.

   b. An open, welcoming campus climate is an important determinant of other-race student enrollment decisions.

   c. The utilization of pre-college and pre-university summer programs as a means of attracting potential students is a powerful device and recognizes that the recruitment of minority students must begin early in a student's high school years.

   d. The establishment of strong linkages in minority student communities (churches, schools, etc.) enhances the visibility of the university and furthers awareness of the educational opportunities available.

   e. Increased use of alternative admission standards as a means of admitting students who do not meet the minimum regular admission requirements, but show potential for successful college work.

4. The institutions, under the direction of the TBR, can collectively hire a consulting firm with expertise in the recruitment of African–American students. This consulting firm will provide ideas on the enhancement of current practices and an assessment of the "best practices" now underway across the country.

5. The parties agree that the community college system provides a rich opportunity for the TBR's four-year institutions to recruit other-race students. As part of its study, the TBR shall propose effective techniques for recruiting transfer students from the state's community college system including those community colleges with large African–American populations.

6. Following the receipt of any external report and recommendations and its own self-studies, the TBR shall report to the parties and the Monitor the specific steps its institutions plan to take to enhance and sustain African–American undergraduate recruitment. The TBR's report shall include a proposed budget for any new initiatives as well as a timetable for implementation. The report shall be submitted within one year of the approval by the Court of this Agreement.

   a. After consulting with the Private Plaintiffs, Plaintiff Intervenors, and the TBR, the Monitor shall recommend to the parties the enhancements and initiatives that in the judgment of the Monitor are educationally sound and practicable and appropriate in light of the obligations and objectives contained in this Agreement. The goal of the Monitor shall be to secure the agreement of the parties on the steps to be taken and to agree to a timetable for implementation. If parties agree on a course of action

and timetable, then the Monitor shall file with the Court the terms of that agreement and the parties shall carry out the agreement.

b. If the parties are unable to agree, then the Monitor in his or her discretion can call upon nationally recognized educational experts to review the issues and offer an opinion. Thereafter, the parties with the help of the Monitor, will again attempt to agree on a course of implementation. If they are unsuccessful, then the Monitor shall so inform the Court and shall file his or her recommendation with the Court.

B. *Specific Actions in Addition to the Committee's Recommendations*

1. In addition to the initiatives that will follow from the self-study the following specific requirements are agreed to and may be incorporated in the recommendations to be prepared by the TBR.

a. Pre–University Programs

1. The State for a period of five years shall provide financial support for the establishment of a summer pre-university enrichment program for rising African–American high school freshmen, sophomores and juniors. Students would be selected on the basis of academic aptitude and recommendations. Criteria for participation shall be set by the institutions. The program's focus shall be on popular undergraduate programs.

2. The program should be designed to accommodate 375 students.

3. The students shall participate in a one- or two-week session. The students will live on campus, attend classes taught by university personnel, and generally experience college life. The TBR will devise the structure of the program and will report to the parties and the Monitor in its report. The objective of the program is to expose students to collegiate life and to provide an opportunity to recognize the benefits of a college education.

4. In designing the program, the TBR may choose to either require all the participating students to be on one campus and then rotate the program every year among the participating institutions, or it could decide to divide students equally among the participating universities every year.

2. Additional Other–Race Financial Aid

a. The State agrees to form a five-year partnership with the TBR System to increase the availability of financial aid for other-race students attending TBR four-year and two-year institutions.

b. For a period of five years, the State and the institutions shall jointly participate in making funding available to support minority financial aid programs. These funds shall be in addition to any existing *Geier* scholarship programs as well as any other scholarship programs currently underway that are directed toward undergraduate minority students. This funding can be used to increase the size of existing scholarship programs or to establish wholly new programs.

c. The State shall cover 40% of the cost of the scholarship program. The amount of the State contribution will depend on the amount of funding contributed to the program by the TBR institutions. The State's total financial commitment shall not, however, exceed $950,000 a year. If the full State match were secured, an additional $2.375 million would be available for other-race undergraduate financial aid programs.

d. TBR officials shall certify the amount of institutional funding contributed to the program. The State shall use existing procedures, or design a procedure, for verification of the amounts.

e. The TBR shall devise a method for distributing the proceeds of the program among its institutions.

## IV. Institutional Commitment to the Recruitment of Other–Race Students[7]

A. The parties agree that the development of an effective recruitment strategy for other-race undergraduate students benefits from the involvement of the entire institution, not just those specifically charged with recruitment. Therefore, the president of each TBR and UT institution must appoint a standing biracial committee composed of faculty, staff and students from throughout the institution whose charge shall be to advise and assist the undergraduate recruitment office in assessing and updating recruitment strategies for other-race students. The committee shall report to the institution's president on an annual basis regarding the committee's assessment of the effectiveness of the institution's other-race recruiting efforts and any modifications to those efforts that in the judgment of the committee ought to be considered. The annual reports of these committees shall become part of the *Geier* reporting required of the Defendants. Each committee shall be chaired by the Director of Undergraduate Admissions.

B. The parties acknowledge that there may be committees of this type already in existence at some or most of the TBR and UT institutions. If so, the charge to those committees shall be expanded to include the requirements of this section.

7. This section applies to TSU.

## V. Graduate Recruitment and Enrollment at Tennessee Technological University

1. The parties agree that TTU shall undertake an assessment of its current graduate recruitment practices to determine if there are other recruitment strategies it could use to attract African–American graduate students. Additionally, the University will assess what other similarly situated institutions in the country are doing to enhance black graduate enrollment, particularly in the engineering disciplines.

2. The University shall prepare a report in which it assesses its own recruitment practices and recommends enhancements to those practices. The report shall also contain a timetable for implementation of any changes recommended as well as a proposed budget for any new initiatives. The report shall be submitted within one year of the approval by the Court of this Agreement.

a. After consultation with the Private Plaintiffs, Plaintiff Intervenors, the University, and the TBR, the Monitor shall recommend to the parties the enhancements and initiatives that in the judgment of the Monitor are educationally sound and practicable and appropriate in light of the obligations and objectives contained in this Agreement. The goal of the Monitor shall be to secure the parties' agreement on the steps to be taken and to agree to a timetable for implementation. If parties agree on a course of action and timetable, then the Monitor shall file with the Court the terms of that agreement and the parties shall carry out the agreement.

b. If the parties are unable to agree, then the Monitor in his or her dis-

cretion can call upon nationally-recognized educational experts to review the issues and offer an opinion. Thereafter, the parties with the help of the Monitor, will again consider a course of implementation. If they are unsuccessful, then the Monitor shall so inform the Court and shall file his or her recommendation with the Court.

## VI. Student Retention and Persistence

A. The parties agree that persistence from year to year and persistence to graduation are valid measures of student retention. Based on the data in the 2000 DMC Report, there is a differential in retention rates between black and white students at some public institutions.

B. The parties agree that APSU, ETSU, UTM, and UTK shall assess their current retention practices and programs and propose changes to those practices that will close the "persistence gap" between black and white students. In cooperation with the respective governing boards' staffs, these institutions shall report to the parties and the Monitor their findings and any proposed changes or enhancements to their current retention practices. The reports shall include a proposed budget for any new initiatives and a timetable for implementation. The report shall be submitted within one year of the approval by the Court of this Agreement.

1. After consultation with the Private Plaintiffs, Plaintiff Intervenors, the universities, and TBR and UT System officials, the Monitor shall recommend to the parties the enhancements and initiatives that in the judgment of the Monitor are educationally sound and practicable and appropriate in light of the obligations and objectives contained in this Agreement. The goal of the Monitor shall be to secure the agreement of the parties on the steps to be taken and to agree to a timetable for implementation. If parties agree on a course of action and timetable, then the Monitor shall file with the Court the terms of that agreement and the parties shall carry out the agreement.

2. If the parties are unable to agree, then the Monitor in his or her discretion can call upon nationally-recognized educational experts to review the issues and offer an opinion. Thereafter, the parties with the help of the Monitor, will again consider a course of implementation. If they are unsuccessful, then the Monitor shall so inform the Court and shall file his or her recommendation with the Court.

3. In examining methods for closing the "persistence gap," the institutions are directed to consider the following:

   a. Students should have access to remedial and/or developmental course work, or tutorial assistance. At institutions where there is not a program for remediation, such institutions should consider partnering with nearby community colleges to provide such services.

   b. Mentor/mentee programs with upperclassmen and alumni have proven effective in retaining students.

   c. Where possible, cooperative programs between industry and the university should be established to encourage students to stay in school by giving them real-world work experience.

4. After reviewing the progress made as a result of any initiatives, the parties will discuss whether the program to close persistence rates should be extended to other specific institutions.

## VII. Expanding Cooperative Extension and Agricultural Research Collaboration Between TSU and UTK

### A. Extension

1. The parties agree that the TSU and UTIA cooperative extension programs benefit from existing collaboration, on-going interaction and continued State support. The parties further agree that other areas of mutually beneficial collaboration between the TSU and the UTIA extension programs should be explored. Additionally, the current administrative and managerial agreements between the extension divisions should also be reviewed and updated to reflect current practices.

2. In order to assess areas of mutual collaboration and enhance existing administrative and managerial agreements, the Administrator of Cooperative Extension Programming at TSU ("Administrator"), and the Dean of Agricultural Extension Service at UTIA ("Dean") shall co-chair a committee whose charge will be to review the current relationship between the extension divisions and make recommendations to further mutually beneficial collaboration and update current administrative and managerial agreements.

3. The recommendations shall be submitted to appropriate university officials at TSU and UTIA for review and action. The committee shall be formed within sixty (60) days after approval by the Court of this Agreement and the report submitted within six months thereafter. Membership on the committee shall be equally divided between persons selected by the Administrator and persons selected by the Dean. A copy of the submitted report shall also be provided to the parties and the Monitor.

### B. Agricultural Research

1. UTIA and TSU both operate agricultural research experiment stations and facilities in various parts of the State. The parties agree that the TSU and the UTIA experiment stations benefit from existing collaboration, ongoing interaction and continued State support. The parties further agree that UTIA and TSU should collaborate to the fullest extent possible in making such facilities and research stations available to researchers regardless of university affiliation and to expand collaboration between agricultural researchers at the universities. To that end, the parties agree that the Director of the TSU Experiment Station and the Dean of the Agricultural Experiment Station will form a committee which they will co-chair to examine these matters and make recommendations to achieve these objectives.

2. The recommendations of the committee shall be submitted to appropriate university officials at TSU and UTIA for review and action. The committee shall be formed within sixty days after approval by the Court of this Agreement and the report submitted within six months thereafter. Membership on the committee shall be equally divided between persons selected by the TSU Director and persons selected by the UTIA Dean. A copy of the submitted report shall also be provided to the parties and the Monitor.

### D. OVERSIGHT

### I. Right to Petition the Court to Review Acts of Alleged Non–Compliance

A. Any party may bring to the Court's attention allegations of non-compliance with the Agreement. As a condition precedent to filing a motion, the party alleging non-compliance must

first give notice to the party whose conduct is alleged to have violated the Agreement, and notice must be sent to all other parties and to the Monitor as well. Thereafter, the involved parties shall attempt to resolve the dispute with the help of the Monitor. If unsuccessful, the party alleging a violation may seek relief from the Court.

## II. Court–Appointed Monitor

A. The parties agree that the Court shall appoint a Monitor whose responsibility shall be to facilitate the orderly and timely implementation of this Agreement and to mediate points of controversy between the parties as they may arise. The parties also agree that the Monitor must be committed to the removal of the vestiges of segregation within Tennessee's system of public higher education and to attainment of the objectives of this Agreement.

B. In addition to the general responsibilities described in the Agreement, the parties believe that the Court should provide the Monitor with the following additional duties and powers:

1. The Monitor shall be authorized to attend the meetings of any committee created as a result of this Agreement.

2. The Monitor shall bring to the attention of the parties any occurrences of non-compliance with the terms of this Agreement. If after first attempting to resolve the matter with the parties directly, the Monitor in his or her judgment continues to believe that a party is in non-compliance with the Agreement, then the Monitor shall so inform the Court.

3. The Monitor shall be permitted to have *ex parte* contact with the parties and counsel.

4. The Monitor shall be permitted from time to time to seek the assistance of nationally-recognized experts in the administration and operation of public institutions of higher education. These experts would work at the direction of the Monitor and would provide a judgment regarding the educational soundness and practicability of any proposals that the Monitor might submit to the experts. The parties agree that any such experts should be persons who have never worked at any of the public or private universities in Tennessee.

5. The Monitor shall report to the Court and the parties twice a year on the status of implementation and the State's compliance with the terms and objectives of the Agreement. At the time the State moves the Court for a declaration of unitary status, the Monitor shall also file a final report with the Court regarding the Monitor's judgment on whether the terms and objectives of the Agreement have been met.

6. If requested to do so by the Court, the Monitor shall file a report and recommendation regarding any issue pending before the Court.

3. The State will be responsible for the reasonable costs of the monitorship.

## III. Collection of Data and the Elimination of the DMC

A. The parties agree that the statistical data annually collected and reported in the Tables of the DMC Report shall be continued for the term of this Agreement unless the parties and the Monitor agree to discontinue one or more tables. The parties further agree that within ninety (90) days of the appointment of a Monitor, counsel and the Monitor shall meet and agree on what other data, if any, shall be collected and how it should be reported. The data that is collected must be sufficient to enable the parties to

make an assessment about the effect of the Agreement. The parties further agree that the data to be collected shall be reported on an annual basis, and that the data is not intended to be a measure of the State's compliance with the terms of this Agreement.

B. The UT Board, the TBR, and THEC shall annually prepare a narrative describing the specific actions they and as appropriate their institutions have taken to implement the terms of this Agreement.

C. The parties agree that the DMC shall be disbanded, and the numeric other-race goals established by the DMC no longer employed.

E. MISCELLANEOUS

I. **Court Jurisdiction and Term of Agreement**

A. The Court shall retain jurisdiction of this case for a period of five years or for a period of time sufficient to insure compliance with the Agreement's terms. As recognized in the introduction, the parties agree that with the implementation of all the provisions of this Agreement, the desegregation of all public institutions of higher education in Tennessee will be attained, the vestiges of segregation eliminated, And pursuant to the procedures set forth in (E)(I)(B) below, the case terminated. At the end of the period of Court supervision, this Agreement shall terminate automatically and without further formality unless extended by the Court upon appropriate motion. Notwithstanding the term of this Agreement, the Court shall retain jurisdiction over the payments to be made by the State to the TSU Endowment until the last agreed-upon payment is made.

B. At the end of the five-year period or at such time not sooner than five years when the State believes it has complied with the terms of this Agreement, the State, may file a motion for a declaration of unitary status provided that the terms and objectives of the Agreement have been met. Any party wishing to oppose unitary status may do so and that party shall bear the burden of showing that the State has failed to fully carry out the Agreement or that vestiges of *de jure* segregation remain. The party objecting to unitary status may move the Court to permit discovery and for an evidentiary hearing on the issue of unitary status.

C. The parties recognize that the Court may upon its own initiative or upon the motion of a party extend or shorten the time of any provision contained in this Agreement.

II. **Reaffirmation of Nondiscriminatory Identity, Practices and Procedures**

A. Each institution and governing board shall reaffirm its non-discrimination policies in all aspects of university and college life, including financial aid, extracurricular activities, hiring and retention of employees, and recruitment and enrollment of students.

B. Each institution of the TBR and UT systems shall continue currently existing policies for dealing with issues of racial harassment on campus.

III. **Existing *Geier* Initiatives and Scholarship Program**

A. The parties agree that the State shall continue to fund all existing *Geier* initiatives and scholarship programs; provided, however, that the existing programs may be modified or eliminated by the development of new and more effective initiatives under the provisions of this Agreement. To the extent the existing *Geier* scholarship programs have been interpreted to apply only to full-time students, the parties now agree that those pro-

grams shall include part-time-degree-seeking students as well. In the event any existing *Geier* program is found by a court to be inappropriate or unlawful, the State shall use the funds from that program to support the various requirements of this Agreement.

IV. **Adoption of Provisions from the 1984 Stipulation of Settlement**

A. Except as specifically set out below, the provisions of the 1984 Stipulation of Settlement are superceded by this Agreement. The provisions listed below are specifically retained:

1. "(F) If either governing board should take any steps in the next five years to increase admissions and/or retention requirements and to establish minimum requirements statewide, the Board will:

"1. Conduct a desegregation impact analysis prior to the implementation of the new requirements, to ascertain whether these new requirements will have an adverse impact on black students;

"2. Authorize institutions to enroll a percentage of new entering classes under alternative admissions standards, said percentage to be determined periodically by the appropriate governing board and to be consistent with the objectives of this [agreement].

2. "(G) Progress in [obtaining the goals of this Agreement] will be a factor in the review of department heads, deans and vice presidents and vice chancellors by institutional presidents and chancellors and in the review of presidents and chancellors by the chief executive officer of each system.

3. "(VII.) The governing boards or the institutions under their jurisdiction will conduct a desegregation impact analysis prior to implementing any proposals for the creation of new institutions or initiating changes in the mission of existing institutions. Defendants commit to implementing no such changes which would be inconsistent with provisions of this [Agreement] or which would adversely affect desegregation of higher education in Tennessee.

4. "(VIII.) Defendants agree that no institution will be identified as a one-race institution or a predominantly one-race institution in any official university publication or in any public statement made in an official capacity by any administrator of that institution. Each institution mission statement shall refer to its mission as an institution committed to education of a non-racially identifiable student body.

5. "(X.) Upon the filing of a motion by any party [or the filing of a report and recommendation required as a result of this agreement] the Court shall hear arguments [if necessary] from counsel for all the parties. The Court shall set [any such hearing] within 60 days [of receipt of the motion or report]."

V. **Access to Consultants Prior to Studies Being Conducted and Opportunity to Comment on Any Desegregation Impact Analyses**

A. The parties agree that in those instances where an outside consultant or consulting firm is hired to conduct a review or assessment, or to provide recommendations, that the consultant or consulting firm shall separately interview the parties or their representatives prior to undertaking the study. The purpose of these interviews is to ensure the consultant has the broadest possible access to information and opinion in advance of the study being designed and implemented.

B. Any desegregation impact study required by the terms of this Agreement shall be made available to the parties and the Monitor, and the parties shall have an opportunity to comment thereon.

## VI. Attorneys' Fees and Expenses

A. Within 30 days of approval by the Court of this Agreement, the Private Plaintiffs and Private–Plaintiff Intervenors shall file their statements of fees and claims for expenses with the State through the Attorney General's Office. These submissions shall comport with the requirements of 42 U.S.C. § 1988.

B. The State then shall have 120 days to review the submissions and to seek clarification. Thereafter the State shall inform those moving for attorneys' fees and expenses what amounts it is prepared to pay voluntarily.

C. If, the State and a movant for attorneys' fees and expenses are unable to agree on the amount of the payment, then the party seeking fees and expenses shall move the Court for an award.

## VII. Other Provisions

A. By consenting to this Agreement, the Defendants are not admitting that they are presently in violation of any constitutional or statutory provision of federal law.

B. The parties consent to the withdrawal without prejudice of all pending motions in this case.

C. The State shall provide funding to support one new full-time staff position at the TBR. This position will be held by an individual whose responsibility it shall be to assist the TBR and its institutions in the implementation of this Agreement.

D. Ten days after the approval of the Agreement by the Court, the State, through the Governor's office, shall provide $75,000 in initial funding to the TBR so that the consultants to be hired under Section B paragraph (I)(B)(1)(a) of this Agreement can begin to work as soon as they are selected, and the TSU coordinating committee established under Section B paragraph (I)(A)(1) can begin its duties.

\* \* \*

Pursuant to Tenn.Code Ann. § 20–13–103 and as evidenced by the signatures below, the Governor, the Comptroller of the Treasury, the Speaker of the Senate, the Speaker of the House and the Attorney General and Reporter authorize settlement in *Geier v. Sundquist,* United States District Court, Middle District of Tennessee, Docket # 5077, according to the terms of the Consent Decree, filed in this cause on this the 19th date of December, 2000.

