Rita Sanders GEIER et al., Plaintiffs,
The United States of America,
Plaintiff-Intervenor,

v.

Winfield DUNN, Governor of the State
of Tennessee and Chairman of the
Board of Trustees of the University of
Tennessee, et al., Defendants.

Civ. A. No. 5077.

United States District Court,
M. D. Tennessee,
Nashville Division.

Feb. 3, 1972.

George E. Barrett, Nashville, Tenn.,
for plaintiffs.

Charles H. Anderson, U. S. Atty.,
Nashville, Tenn., Paul F. Hancock, Dept.
of Justice, Washington, D. C., for plain-
tiff-intervenor.

David M. Pack, Atty. Gen. of Tenn.,
Nashville, Tenn., James E. Drinnon, Jr.,
Asst. Gen. Counsel, Univ. of Tenn., Knox-
ville, Tenn., for defendants.

## MEMORANDUM AND ORDER

FRANK GRAY, Jr., Chief Judge.

Plaintiffs filed this action on May 21, 1968, to enjoin construction of the then-proposed Nashville Center of the University of Tennessee on the ground that it would, as an identifiably white institution, be duplicative of the courses and services offered at Tennessee State University [1] and would therefore tend to perpetuate that latter institution as an identifiably black school, hence preventing the effective disestablishment of the racially dual system of public higher education in Tennessee. On July 22, 1968, the United States intervened as a party-plaintiff, seeking both the injunction against the proposed construction referred to above and an order requiring the defendants to prepare and submit a plan calculated to produce meaningful desegregation of the public institutions of higher education in Tennessee.

Following a hearing, this court found that "the dual system of education created originally by law [for the public colleges and universities of Tennessee] has not been effectively dismantled." Sanders v. Ellington, 288 F.Supp. 937, 940 (M.D.Tenn.1968). The court then went on to hold that there is "an affirmative duty imposed upon the State by the Fourteenth Amendment to the Constitution of the United States to dismantle the dual system of higher education which presently exists in Tennessee." Id. at 942. Based upon its finding that there had been "no genuine progress toward desegregation and no genuine prospect of progress" (id.), this court entered an order refusing to enjoin the construction of the proposed Center, but requiring defendants to submit, by April 1, 1969, "a plan designed to effect such desegregation of the higher educational institutions of Tennessee, with particular attention to Tennessee A & I State University, as to indicate the dismantling of the dual system now existing." Id.

The plan which was submitted by defendants as a result of the aforesaid order placed heavy emphasis upon the individual efforts of the various institutions within the ambit of that order, mainly to increase minority group enrollment, and it stated that each such institution would "continue and expand efforts to recruit qualified Negro students"; would "intensify [its] efforts to recruit and retain Negro faculty"; and would implement pre-enrollment activities for minority group students who have academic deficiencies by virtue of past academic deprivations.[2] With particular regard to Tennessee State University, the plan stated that Tennessee State would intensify its efforts to recruit white students, intensify its efforts to recruit additional white faculty members, and "give concentrated attention to developing and publicizing academic programs which will attract white, as well as Negro students, from the Nashville area." [3]

The plan also stated that the public institutions of higher education in the Nashville area [4] would institute inter-institutional programs which would help achieve meaningful racial balance in enrollments.[5] The plan provided that these institutions would arrange for joint faculty appointments, would allow students complete transfer of course credits from one institution to another, and would avoid duplication of degree-granting curricula among these institutions.

Objections to this plan were filed by both the private plaintiffs and the plaintiff-intervenor, and after a hearing on depositions, this court, on December 23, 1969, entered an order stating that the plan—on the basis of the information

---

1. At that time, Tennessee State was officially designated Tennessee A & I State University.

2. 1969 Plan, p. 3.

3. 1969 Plan, pp. 5–6.

4. The University of Tennessee-Nashville, Tennessee State, Austin Peay, and Middle Tennessee State.

5. 1969 Plan, p. 6.

then before the court—could be neither approved nor disapproved. The court noted the plan's lack of specificity and ordered the defendants to file, by April 1, 1970, "a report showing precisely what has been done on each individual item set forth in the plan. . . ." (Order entered December 23, 1969.) The court also reiterated its previously expressed conclusion "that the state does have a Constitutional duty to dismantle any state-supported dual system of education, at any level." *Id.*

The defendants filed their report on April 1, 1970. The report stated that the number of black students enrolled in public institutions of higher education in the state (exclusive of Tennessee State) increased 42.2 percent between the academic year 1968–1969 and the academic year 1969–1970. This represented an increase of from 2,720 students to 3,869, but it should be noted that this increase in black students attending predominantly white institutions occurred at the same time that Tennessee State was making no gain. Nevertheless, it is readily apparent that, with the exception of the situation at Tennessee State, substantial progress was made on a statewide scale in attracting members of the Negro race to the public institutions of higher education in Tennessee.

The report revealed that, although the percentage of black students receiving financial aid decreased from 31.7 percent to 28.2 percent during the period covered, the actual dollar amount of financial aid utilized by black students increased from $507,000 in the academic year 1968–1969 to $775,000 in the academic year 1969–1970. This represented an increase of 53 percent, which is quite substantial.

The report showed somewhat more disappointing results, however, with regard to the success of the institutions in question (with the exception, of course, of Tennessee State) in attracting black faculty members. According to the report, the percentage of blacks among the faculties of these institutions increased from .4 percent in the academic year 1968–1969 to .9 percent in 1969–1970. The report stated that seven (7) members of the Tennessee State faculty taught on a part-time basis at the U.T.-Nashville Center in 1969–1970, while two (2) members of the engineering faculty of U.T.-Nashville taught, on the same basis, at Tennessee State.

Although the report revealed efforts to establish a joint engineering program between U.T.-Nashville and Tennessee State, no agreement had been reached on the matter as of the time the report was filed.

On June 3, 1970, the individual plaintiffs filed a "Motion for Further Relief." The ground for this motion was the individual plaintiffs' contention that the plan and report discussed above (of April 1, 1969, and April 1, 1970, respectively) did not "set forth a plan for the dismantling of the dual system of public higher education in the State of Tennessee, as ordered by this Court."

A hearing was set for June 14, 1971, on the individual plaintiffs' motion for further relief. However, on that date defendants filed a "Desegregation Progress Report." Thus, in order to allow time for the court and the parties to consider and evaluate the new report, the date of the hearing was reset to June 15, 1971.

The June 14, 1971, report again emphasizes the efforts of each institution in question, on an individual basis, to increase the pace of desegregation. The only cooperative program to be revealed which appears to be of any significance is the recently-arranged joint engineering degree program between U.T.-Nashville and Tennessee State.[6] Even so, the report does not clearly indicate

---

6. Middle Tennessee State, Tennessee State, and U.T.-Nashville have also agreed to offer a cooperative program leading toward the Specialist in Education Degree. However, this agreement merely permits, and does not require, students to take courses at each campus. On the other hand, the testimony revealed that there may be some duplication of programs, such as the nursing program, by U.T.-Nashville and Tennessee State.

either the number of students and faculty that would be involved or the amount of time each participating individual would spend at the respective schools. Hence, the impact of this program upon the disestablishment of Tennessee's dual system of public higher education cannot be accurately evaluated.

With regard to the success of the efforts of the individual institutions in question, the 1971 report discloses varying results. Significant success in desegregation has been attained by Memphis State University and by the recently-established community colleges. The results attained by the other formerly all-white institutions were fair but less impressive, at least in terms of the *rate* at which desegregation is being accomplished. Further, none of the predominantly white institutions showed any significant progress in faculty desegregation; in a majority of these institutions black professors constituted less than two percent of the total faculty. It is beyond question, however, that some good faith efforts have been made to attract black faculty members to these institutions and that such efforts have in large measure failed for the reason, simply stated, that more attractive employment opportunities are available elsewhere.

By way of contrast, the student body of Tennessee State is shown as 99.7 percent black during the academic year 1970–1971 and its faculty as 81 percent black during that period. Also of significance is the reported fact that the freshman class at Tennessee State for this year was 99.9 percent black.

It is thus clear that Tennessee State remains, in all practical respects, a black institution, while the institutions in close proximity to it, as well as some other institutions in other parts of the State, remain in large part white. And, while it is clear that the desegregation progress of the predominantly white institutions has been steady, the phenomenon of a black Tennessee State, so long as it exists, negates both the contention that defendants have dismantled the dual system of public higher education in Tennessee, as ordered by this court, and the contention that they are, in any realistic sense, on their way toward doing so. The problem before the court, then, is what must be done now? The answer is not simple, for, indeed, the law is not clear.

■ At first blush, the waters appear to have been muddied since the rendition of this court's original opinion in the case at bar, both with regard to the nature and scope of the duty imposed by the Constitution upon the States concerning elimination of the vestiges of *de jure* segregation in public institutions of higher education and with regard to the actual power of the federal courts to require that that duty be performed. Two threshold questions, then, that must be given consideration in the present context are: (1) whether (frankly stated) this court erred in holding, in its original opinion in this case, that the defendants are under an affirmative duty actually "to dismantle" the dual system of education as it exists in Tennessee; and (2) whether, even if such duty exists, this court has the power to require anything other than a good faith "open door" policy in order to exact such duty. Accordingly, these two questions will be covered in the following discussion.

Ironically, the movement for racial equality in education had its beginning at the college and university level, and it was well established years before Brown I [7] that racial discrimination in public institutions of higher learning violates the fourteenth amendment. Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938); Sipuel v. Board of Regents, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247 (1948); Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950); McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950). Moreover, the principles of *Brown I*,

7. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

with regard to the invalidity of the "separate-but-equal" doctrine, were promptly extended into the area of higher education following that decision. Florida ex rel. Hawkins v. Board of Control, 350 U.S. 413, 76 S.Ct. 464, 100 L.Ed. 486 (1956).

Notwithstanding the foregoing, defendants assert that a good faith open door policy satisfies the requirements of the fourteenth amendment. In support of this assertion, they rely upon the decision of the three-judge court rendered in the case of Alabama State Teachers Association v. Alabama Public School and College Authority, 289 F.Supp. 784 (M.D.Ala.1968) (hereinafter referred to as *"ASTA"*), and the fact that that decision was summarily affirmed, upon motion, by the Supreme Court of the United States, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969).

The *ASTA* case was initiated to challenge the proposed construction in Montgomery, Alabama, of a branch of Auburn University. Already located in Montgomery was Alabama State College, a four-year institution originally established, and traditionally maintained, by the State for black students exclusively. The three-judge court refused to enjoin the proposed construction,[8] giving the following statement as the basis for its holding:

> "We conclude, therefore, that as long as the State and a particular institution are dealing with admissions, faculty and staff in good faith the basic requirement of the affirmative duty to dismantle the dual school system

on the college level, to the extent that the system may be based upon racial considerations, is satisfied." *ASTA*, 289 F.Supp. at 789, 790.

To determine whether the affirmance of *ASTA*, in the summary manner in which it was effected, did or did not constitute approval of the "conclusion" quoted above, it is necessary to analyze the case in some detail, in the light of the effect upon the area of the law herein under consideration of a second three-judge court decision, apparently in direct conflict with *ASTA*, which also was summarily affirmed by the Supreme Court of the United States—namely, Norris v. State Council of Higher Education, 327 F.Supp. 1368 (E.D.Va.1971) (Hoffman, J., dissenting), aff'd. sub nom Board of Visitors of the College of William and Mary in Virginia, 404 U.S. 907, 92 S.Ct. 227, 30 L.Ed.2d 180 (1971) (memorandum).

In *Norris*, the relief granted was substantially similar to that which was denied in *ASTA*. The *Norris* plaintiffs sought to enjoin the escalation of a predominantly white junior college to a four-year college on the ground that such escalation would ". . . frustrate the efforts of its neighbor, predominantly black Virginia State College, to desegregate." *Norris* at 1369.[9] The defendants contended that the *ASTA* conclusion, as quoted above, was the "controlling law of the case." To this contention, the *Norris* court replied:

> "We cannot subscribe to the proposition that the Supreme Court represented in a one sentence memorandum

8. It should be noted that, in ASTA, there was no request to require the defendants to develop and implement a comprehensive plan of dismantling the dual system of higher education throughout the State of Alabama, and there was no request that the court require affirmative action which would lead to the integrating of Alabama State College, other than the possible effect of the requested injunctive relief.

9. The Norris plaintiffs also sought the "ultimate merger" of the two institutions involved, and an order directing the Governor and the Council of Higher Educa-

tion to prepare a plan for the desegregation of all state colleges and universities in the State. Finding no "present need" for the merger, the court denied this relief, without prejudice, stating that future developments at the institutions might alter the situation complained of. It also denied plaintiffs' request for an ordered plan for the desegregation of all state colleges and universities, but did so on procedural grounds "without comment on its merits," pointing out that all persons necessary for adjudication of this aspect of the case had not been joined as defendants.

decision that it approved every statement in the district court's opinion. The rule is appropriate for the result reached in *Alabama State Teachers Ass'n*, but removed from its context, it does not furnish a universal definition of a state's obligation to abolish a racially dual system of higher education." *Norris* 327 F.Supp. at 1372. And, upon this basis, the court went on to grant the injunction.

What, then, is the law which this court must follow in the instant case, given these two apparently diametrically opposed results, each of which was affirmed summarily by the Supreme Court? A further analysis of the *ASTA* opinion yields the answer to this question, and such analysis is here in order.

It should be noted at the outset that *ASTA* expressly recognizes the existence of "the affirmative duty to dismantle the dual school system on the college level." *ASTA* 289 F.Supp. at 789. Clearly, then, *ASTA* does *not* stand for the proposition that a state is under *no* affirmative duty to dismantle a dual system of higher education in those cases where such a system is a vestige of *de jure* segregation. This court is thus of the opinion that *Norris* is correct in stating that, while "[t]he means of eliminating discrimination in public schools necessarily differ from its elimination in colleges,[10] . . . *the state's duty is as exacting.*" *Norris* 327 F.Supp. at 1373 (emphasis added).

With the foregoing points in mind, this court feels that the key to the *ASTA* result can be found in the following language:

"Plaintiffs fail to take account of some significant differences between the elementary and secondary public schools and institutions of higher education and of some related differences concerning the role the courts should play in dismantling the dual systems. Public elementary and secondary schools are traditionally free and compulsory. Prior to 'freedom of choice,' children were assigned to their respective schools. This could be done with equanimity because, in principle at least, one school for a given grade level is substantially similar to another in terms of goals, facilities, course offerings, teacher training and salaries, and so forth. In this context, although reluctant to intervene, when the Constitution and mandates from the higher courts demanded it, we felt that desegregation could be accomplished, and that the requirements of the law would be met, without our being involved in a wide range of purely educational policy decisions. Accordingly, we felt, in dealing with the problem of desegregating the elementary and secondary public schools, that we could and should review decisions concerning the impact of site selection for new construction or expansion without overreaching our area of competence.

"Higher education is neither free nor compulsory. Students choose which, if any, institution they will attend. In making that choice they face the full range of diversity in goals, facilities, equipment, course offerings, teacher training and salaries, and living arrangements, perhaps only to mention a few. From where legislators sit, of course, the system must be viewed on a statewide basis. In deciding to open a new institution or build a branch or expand an existing institution, and in deciding where to locate it, the legislature must consider a very complicated pattern of demand for and availability of the above-listed variables, including, also, impact on the dual system. We conclude that in reviewing such a decision to determine whether it maximized desegregation we would necessarily be involved, consciously or by default, in a wide range of educational policy decisions in which courts should not become involved." *ASTA* 289 F.Supp. at 787, 788.

Several points are apparent in the foregoing quotation.

---

10. For reasons explored in more detail below. *Compare* ASTA, quoted *infra*.

*First.* The *ASTA* court *was* consistent with the *Norris* line of reasoning, being concerned primarily with an injunction against the proposed construction of the Auburn branch. The court obviously felt that the decision to construct the Montgomery branch was a considered one on the part of Alabama educational officials, which, at least on the basis of the evidence before the court, *had* taken into account the "impact on the dual system" (*id*) of such construction. The court thus apparently held the belief that to enjoin such construction would amount to nothing more than an almost presumptuous substitution of the court's judgment for that of the state officials involved, there being no good grounds for such substitution, on the basis of the record in that case. Thus, *ASTA* is distinguishable from the case at bar on the ground that the *ASTA* court merely refused to enjoin certain construction, on the basis of the facts before it. But this court feels that merely to note that *ASTA* is distinguishable from the case at bar, without analyzing it further, would be to ignore the real import of the *ASTA* decision.

*Second.* It is apparent in the foregoing quotation that the *ASTA* court carefully distinguishes between the situation regarding the integration of lower public educational facilities and the situation regarding integration of those of higher education. In the latter case, the *ASTA* court points out, without clearly articulating the same, that a federal court necessarily cannot proceed, insofar as the framing of relief is concerned, in the same manner (and perhaps with the same abandon) as it could in the former case. Thus, regarding the disestablishment of á dual system of higher education, a court cannot—at least in the usual situation [11]—order the transfer of faculty from one institution to another, order the transfer of students from one institution to another, or actually set the curricula at various such institutions. Over and above the question of such a court's actual *power* to do so, such relief would not be administratively feasible, because there would be no way to ensure that it actually worked: [12] no court can "order" a student to confine himself to one college or university instead of another, for, unlike the situation in a system of elementary or secondary education, such persons are free to leave and go elsewhere as they wish. The lesson is that, when it comes to the disestablishment of a dual system of higher education, a federal court *cannot* do what it might do in the realm of lower and secondary education: what works in one system will not work in another. Yet this is so as a practical matter, and not as a result either of there being less of a duty owed by a state to dismantle a dual system of higher education or of a lack of power—at least in a jurisdictional sense—on the part of a federal court to remedy such a situation. The limiting factor, from the court's point of view, is "What will work?"

*Third* (and in summary). It is apparent that the real concern of the *ASTA* court was with the problem of a balancing of the many interests and considerations that a court of equity traditionally must take into account before framing relief. Thus the *ASTA* court, in its opinion, performed as a traditional court of equity would perform, *without actually so stating*, and the usual equitable "balancing of interests" is what actually occurs in that opinion, without a clear enumeration of the interests involved.

It thus seems to follow that both *ASTA* and *Norris* are perfectly consistent with the approach recently taken by

---

11. *But see* Lee v. Macon County Board of Education, 317 F.Supp. 103 (M.D. Ala.1970), wherein a three-judge court, which included the author of ASTA, ordered, *per curiam*, some of the same sort of changes with regard to institutions of higher learning as are usually ordered in the context of integrating elementary and secondary schools, including a type of "busing."

12. Which is a traditional requisite for a court of equity to take jurisdiction of a controversy.

a unanimous Supreme Court in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed. 2d 554 (1971), where the scope of a district court's equity power, in handling school desegregation cases generally, is precisely defined:

"Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.

". . . [A] school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right. *The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution. . . . [and] [a]s with any equity case, the nature of the violation determines the scope of the remedy.*" *Id.* at 15, 16, 91 S.Ct. at 1276 (emphasis added).

 From a consideration of both *ASTA* and *Norris*, read in the light of the whole line of desegregation cases, culminating in *Swann*, this court is of the opinion that the present state of the law is as follows: (1) There is an affirmative duty on a state to dismantle its dual system of education, when such system is a vestige of *de jure* segregation; (2) "The means of eliminating discrimination in public schools necessarily differ from its elimination in colleges, but [(3)] the state's duty is as exacting" *Norris*, 327 F.Supp. at 1373; (4) a federal district court, in order to ensure that such duty is performed, is to proceed as a traditional court of equity; (5) accordingly, in framing relief, the court must balance the interests involved and take into account the administrative feasibility of the proposed relief, and, in fashioning the remedy, the scope of the relief must be fitted to the scope of the violation; and (6) in cases involving higher education, the interests of the

state in setting its own educational policy are to be given especially great weight.[13]

Thus, in cases involving higher education, an open door policy, coupled with good faith recruiting efforts (as well, perhaps, as provision for remedial education for the educationally-underprivileged), is sufficient *as a basic requirement*: the great weight to be given the state's interest in making its own educational decisions compels this result, for, until it is apparent that such a policy is a failure, any more drastic remedy would constitute an untoward encroachment into the area of the state's interest.

But this "basic requirement" is not enough in those situations where it clearly fails to accomplish the ends sought. Surely, if there is an *affirmative duty* on the states *to dismantle* their dual systems, something more is required when the basic approach fails.

In such a case, the approach of the district court remains the same: it balances the various interests involved, takes into account the workability of the proposed relief, and measures the gravity of the situation to be remedied against all of these factors in deciding upon the gravity of the relief required. Thus, when the basic (and preferred) approach of an open door policy fails to be effective, the interest of the state in completely setting its own educational policy must give way to the interests of the public and the dictates of the Constitution.

Given the facts of the case at bar and applying the foregoing considerations to them, this court is of the opinion that, *with the exception of TSU*, defendants are proceeding to dismantle their dual system of higher education, taken as a state-wide whole, at a constitutionally-permissible rate of speed. Though their degree of success is in some respects disappointing, the fact remains that, again, except for the TSU phenomenon, the minority enrollment throughout Tennessee's schools and colleges is increasing on a regular basis year by year. There-

13. This last proposition, this court feels, is the true teaching of the ASTA case.

fore, a continuance of present programs and policies would appear to satisfy constitutional requirements as to these schools.

With regard to Tennessee State, however, two things are apparent. First, the approach heretofore adopted by the state has not worked and, indeed, appears to contain no prospect of working. Second, the constitutional violation which the present racial composition of that institution constitutes is of a severe and egregious nature. In such a situation, the interest of the state must give way to the constitutional requirement: defendants must carry out their "affirmative duty," and, if an open door policy will not work, then more radical remedies are required.[14]

With reference to the manner in which desegregation of Tennessee State University may be accomplished, the evidence heard by the court seemed in substantial agreement that white students would not be attracted to the school in any substantial numbers until there is what might be termed "white presence" on the campus. To provide this, it is ordered that defendants submit to the court by March 15, 1972, a plan to be implemented at the beginning of the 1972 academic year, such plan to provide, *as a minimum*, for the substantial desegregation of the faculty [15] at TSU and the allocation to the campus of TSU of programs which will *ensure*, in the opin-

ion of defendants, a substantial "white presence" on the campus.

Defendants have at their command all of the information needed as to curricula and programs which may be utilized in complying with this order. It is pointed out to them that the court is aware of two programs which may be considered by them, *i. e.*, the duplicative nursing program at U.T.-Nashville and the School of Social Work, housed on the U.T.-Nashville campus but not a part of the school.

Again, the court reminds defendants that it is, for the present, leaving to them the exact procedures to be employed by them in complying with their constitutional duty. It is also pointed out to defendants that the court recognizes that compliance with the above order will not result in the adequate desegregation of TSU. Accordingly, it is further ordered that defendants consider additional methods for the accomplishment of this end and report thereon to the court by August 1, 1972. Such study and report should include the feasibility or non-feasibility of a merger or consolidation of Tennessee State [16] and U.T.-Nashville into a single institution, possibly with two campuses, under the aegis and control of either the Tennessee Board of Education, the Board of Trustees of the University of Tennessee, or a combination of the two, the feasibility or non-feasibility of cur-

---

14. It should also be pointed out in the present context that ASTA makes very clear that, even if an open door policy were all—categorically—that was required, then even that is true *only* in the presence of "good faith." ASTA 289 F.Supp. at 789. The court need not inquire into the presence *vel non* of "good faith" in the present context. However, *quaere*: does not the *fact* of a segregated school itself imply bad faith under the present circumstances? More specifically, is a state actually in good faith in not, on its own, going beyond a court order if such is necessary to remedy a blatantly unconstitutional situation, when it is within the state's power to do so? Is it not bad faith for a state to fail

to do everything in its power to remedy injustice?

15. As hereinbefore stated, defendants have continually asserted that a scarcity of black professors exists. The record does not show a similar scarcity of white professors. A method of transfers, using such inducements as may be necessary, should be feasible.

16. Although Tennessee State is generally referred to as a "regional" university, the court takes judicial notice of the fact that it was not so created and its very name implies the contrary. *Cf.* East Tennessee State University, Middle Tennessee State University, Memphis State University.

riculum consolidation of undergraduate and graduate programs of the State's colleges in the general Nashville area, and such other matters as the defendants deem pertinent to the solution of the problem.