*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0186P (6th Cir.)
File Name: 04a0186p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

RITA SANDERS GEIER;
PATRICK J. GILPIN; ERNEST
TERRELL; HAROLD SWEATT;
PHILLIP SWEATT, Individually
and as Next Friend of Phillip
Sweatt; CITIZENS AND
RESIDENTS OF THE STATE OF
TENNESSEE; CITIZENS OF THE
UNITED STATES,
        *Plaintiffs-Appellants,*

v.

DON SUNDQUIST, et al.,
        *Defendants-Appellees.*

No. 02-6400

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 68-05077—Thomas A. Wiseman, Jr., District Judge.

Argued: April 27, 2004

Decided and Filed: June 18, 2004

Before: COLE and COOK, Circuit Judges; SPIEGEL,*
District Judge.

_____

**COUNSEL**

_____

**ARGUED:** Lewis R. Donelson III, BAKER, DONELSON, BEARMAN & CALDWELL, Memphis, Tennessee, for Appellants. Richard F. Haglund III, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees. **ON BRIEF:** George E. Barrett, Edmund L. Carey, Jr., BARRETT, JOHNSTON & PARSLEY, Nashville, Tennessee, for Appellants. Kathleen A. Eyler, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees.

COLE, J., delivered the opinion of the court, in which SPIEGEL, D. J., joined. COOK, J. (pp. 23-25), delivered a separate dissenting opinion.

_____

**OPINION**

_____

R. GUY COLE, JR., Circuit Judge. Appellants, the Geier Plaintiffs, appeal the district court's judgment awarding them $376,587.50 in attorneys' fees pursuant to 42 U.S.C. § 1988 for legal services performed in connection with this civil rights action – ongoing for the past thirty-six years – which led to the desegregation of Tennessee's public higher education system. The Geier Plaintiffs contend that the district court abused its discretion in: (1) declining to award fees pursuant to the "common fund"/"common benefit" method; (2) setting a lodestar rate of $250 per hour where the

_____
*The Honorable S. Arthur Spiegel, United States District Judge for the Southern District of Ohio, sitting by designation.

Geier Plaintiffs had requested and submitted market data supporting an hourly rate of $400; and (3) considering the *Johnson* factors legally unavailable for establishing and enhancing the lodestar figure. We find no abuse of discretion in the district court's declining to use the "common fund"/ "common benefit" method for calculating attorneys' fees. However, because of errors in the district court's analyses concerning the appropriate hourly rate and the Geier Plaintiffs' entitlement to an upward adjustment of the fee award, we vacate the fee award and remand this case to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

This action, which was filed in 1968, concerns the desegregation of Tennessee's public universities. The facts and lengthy history of this litigation have been set forth in the prior opinions of this Court and the district court. *See Geier v. Sundquist*, 94 F.3d 644 (6th Cir. 1996); *Geier v. Richardson*, 871 F. 2d 1310 (6th Cir. 1989); *Geier v. Alexander*, 801 F.2d 799 (6th Cir. 1986); *Geier v. Alexander*, 593 F. Supp. 1263 (M.D. Tenn. 1984); *Geier v. University of Tennessee*, 597 F.2d 1056 (6th Cir.), *cert. denied*, 444 U.S. 886 (1979); *Geier v. Blanton*, 427 F. Supp. 644 (M.D. Tenn. 1977); *Geier v. Dunn*, 337 F. Supp. 573 (M.D. Tenn. 1972); and *Sanders v. Ellington*, 288 F. Supp. 937 (M.D. Tenn. 1968). Because, however, the matter before us benefits from an appreciation of the history and magnitude of this action, we set forth the case's background here.

In 1968, several African-Americans (the "Geier Plaintiffs") sued the Governor of Tennessee, the University of Tennessee ("UT"), Tennessee A & I State University, and various Tennessee educational agencies and officials to enjoin UT from expanding its program at a non-degree-granting educational institution in Nashville. The complaint alleged that any expansion of UT Nashville would affect the efforts of Tennessee State University ("TSU"), a predominantly

African-American institution, to desegregate its student body and faculty. The United States intervened as a plaintiff in 1968, requesting more expansive relief sought by the original plaintiffs. The United States asked the court to "order the State defendants to present a plan calculated to produce meaningful desegregation of the public universities in Tennessee." *Sanders*, 288 F. Supp. at 939. The case soon became the vehicle for the desegregation of state-affiliated colleges and universities throughout Tennessee. In 1973, a group of parents, teachers, and faculty members were allowed to intervene ("Richardson Intervenors"). In 1983, the district court allowed another group of African-American and white TSU faculty members and students to intervene ("McGinnis Intervenors"). Also in 1983, the district court permitted the TSU Alumni Association to appear as amicus curiae.

The district court found that six years elapsed after *Brown v. Board of Education*, 347 U.S. 483 (1954), before racial requirements for admission to Tennessee's public universities and colleges were abolished. Although all of the state's public higher education institutions had non-discriminatory open door admissions by 1968, the district court found that "the dual system of education created originally by law has not been effectively dismantled." *Sanders*, 288 F. Supp. at 940. Relying on *Green v. County School Board*, 391 U.S. 430 (1968), the district court stated that it was "convinced that there is an affirmative duty imposed upon the State by the Fourteenth Amendment to the Constitution of the United States to dismantle the dual system of higher education which presently exists in Tennessee." *Id.* at 942. The court then ordered Defendants to submit a plan "designed to effect such desegregation of the higher educational institutions in Tennessee, with particular attention to Tennessee A & I State University, as to indicate the dismantling of the dual system now existing." *Id.* Defendants did not appeal.

Defendants submitted a plan to the court that relied primarily on the efforts of predominantly white institutions to expand efforts to recruit black students and faculty. The plan

called for TSU to recruit white students and faculty and to develop and publicize academic programs that would attract white as well as black students from the Nashville area. The Geier Plaintiffs and the United States filed objections to the plan, and, after a hearing, the district court found that the plan lacked specificity. Instead of disapproving the plan, however, the district court directed Defendants to file a report showing what had been done to implement each component of the plan.

Defendants' report showed some progress in attracting African-American students to the formerly all-white institutions, but little improvement in the number of black faculty at those schools, and virtually no progress in desegregating TSU. The Geier Plaintiffs filed a motion for further relief, contending that the plan and report failed to offer a scheme for dismantling the dual system of public higher education, as ordered by the court. While that motion was being considered by the district court, a new report showed that TSU remained 99.7% African-American and that its entering class in the fall of 1970 was 99.9% African-American. The district court found that so long as TSU remained overwhelmingly black, it could not be said that Defendants had dismantled the dual system or that they were "in any realistic sense, on their way toward doing so." *Geier v. Dunn*, 337 F. Supp. 573 (M.D. Tenn. 1972).

The district court found that an "open door policy, coupled with good faith recruiting efforts . . . is sufficient *as a basic requirement*" for desegregating institutions of public higher education. *Id.* at 580 (emphasis in original). However, the court held, where this basic requirement fails to eliminate identifiably "white" and "black" institutions, something more is required. Defendants were ordered to present another plan to the court by March 15, 1972, that would provide for substantial desegregation of the TSU faculty and ensure a substantial white presence on the TSU campus. *Id.* at 581.

In the subsequent years, Defendants submitted several plans, and the district court ordered that some courses and fields of study be offered exclusively at UT Nashville. Eventually, all of the plaintiffs, including the United States, proposed a merger of TSU and UT Nashville, with TSU as the surviving institution. The district court held a month-long evidentiary hearing on this proposal in 1976. After considering voluminous records and testimony, the district court found steady, but slow progress in attracting black students and faculty to the formerly-white institutions, but, as before, little or no progress in converting TSU from a one-race university. The court concluded that the plans applied in the course of the eight years that the litigation had been active had not worked and showed no prospect of working. The court therefore ordered the merger of TSU and UT Nashville into a single institution under the state's Board of Regents. The district court chose this "drastic remedy" because "the State's actions have been egregious examples of constitutional violations." *Geier v. Blanton*, 427 F. Supp. 644, 660 (M.D. Tenn. 1977).

In affirming the district court, *Geier v. University of Tennessee*, 597 F. 2d 1056 (6th Cir.), *cert. denied*, 444 U.S. 886 (1979), we held that the pronouncement in *Green v. County School Board* of an affirmative duty to remove all vestiges of state-imposed segregation applies to public higher education as well as to education at lower levels. *Geier*, 597 F.2d at 1065 ("[T]he state's duty is as exacting to eliminate the vestiges of state-imposed segregation in higher education as in elementary and secondary school systems; it is only the means of eliminating segregation which differ.") (quotation and citation omitted)). We also held that the district court's factual findings were not clearly erroneous, *id.* at 1067, and that the remedy ordered was within the traditional bounds of equitable relief. *Id.* at 1068.

### A. *The 1984 Settlement*

The history of the litigation to this point illustrates the arduous path along which the original parties and Defendants traveled before they entered a stipulation of settlement ("Settlement") on September 25, 1984. *Geier v. Alexander*, 593 F. Supp. 1263 (M.D. Tenn. 1984), *aff'd*, 801 F.2d 799 (6th Cir. 1986). All of the parties, except for the United States, agreed to the comprehensive Settlement requiring Defendants to implement numerous new desegregation programs throughout Tennessee's system of higher education, including: (1) attempting to obtain a student body at TSU that is 50% white; (2) assuring that changes in admissions policies do not have an adverse racial impact; and (3) actively recruiting African-American faculty and administrative staff for Tennessee's predominantly white institutions. The Settlement also established a monitoring committee and provided for the resolution of disputes among the parties. "The plan embodied in the [Settlement] was the culmination of long hours and days of negotiations in which all parties, including the United States, participated." *Geier*, 801 F.2d at 802.

But the struggle to desegregate Tennessee's system of higher education continued. Shortly after the district court approved the Settlement, the United States filed a memorandum challenging many of the programs contained in the Settlement. The district court rejected the Government's arguments and the Government appealed to this Court, *Geier v. Alexander*, 801 F.2d 799 (1988), challenging only that part of the Settlement that established a pre-professional program pursuant to which seventy-five qualified African-American sophomores would be selected each year and guaranteed admission to one of the state' professional schools upon completing his or her undergraduate work and satisfying the relevant school's admissions standards. The Government argued that this constituted a "racial quota" system, but this Court rejected that argument and affirmed the district court's judgment authorizing the Settlement.

Next ensued a request for interim attorneys' fees by the individual plaintiffs and state defendants, who claimed that they were the "prevailing parties" within the meaning of 42 U.S.C. § 1988 after the United States intervened in this suit, sought relief beyond the injunction requested by the private parties, and then challenged the Settlement entered into between the parties and approved by the district court, requiring both the private plaintiffs and Defendants to defend the Settlement's terms. The district court awarded attorneys' fees against the United States to the Geier Plaintiffs and the state. The United States appealed and we vacated the award. *Geier v. Richardson*, 881 F.2d 1075, No. 88-5155, 1989 WL 90761 (6th Cir. Aug. 11, 1989).

### B. *The 2001 Consent Decree*

In 1994, the state moved to vacate the 1984 Settlement and terminate the litigation based, in part, on a change in the law stemming from the Supreme Court's decision in *United States v. Fordice*, 505 U.S. 717 (1992), which addressed Mississippi's dual system of public higher education. In 1996, again relying on *Fordice*, Defendants moved for a judgment on the pleadings. The district court did not rule on the motion to vacate, and it eventually denied the state's motion for judgment on the pleadings.

Ultimately, in January of 2000, the parties entered voluntary mediation. Once again, the parties devoted substantial time to considering the state of racial equality in Tennessee's system of higher education. In January 2001, the parties entered into a Consent Decree, *Geier v. Sundquist*, 128 F. Supp. 2d 519 (M.D. Tenn. 2001), which states, in part:

In dismantling the vestiges of the former dual system, it is the parties' intention to create an education system that enhances the increased enrollment of African American students at the predominantly white institutions and that likewise enhances the enrollment of white students at the State's predominantly black institution. To achieve this

goal, the parties are committed to maintaining educational institutions that are committed to desegregation and to reaching out to all residents of this State regardless of race. It is also the intention of the parties that employment and promotion decisions within the State's system of higher education be made in an environment unfettered by the discriminatory practices of the old dual system. The goal is to increase the presence of other-race faculty, staff, and administrators on the campuses of the State's colleges and universities.

128 F. Supp. 2d at 521.

## C. *Attorneys' Fees*

Pursuant to the 2001 Consent Decree, the Geier Plaintiffs, the Richardson Intervenors, and the McGinnis Intervenors filed applications for attorneys' fees with the Tennessee Attorney General. The McGinnis Intervenors reached an agreement with the state and were paid attorneys' fees in June 2001. However, unable to agree on an award amount with the state, the Geier Plaintiffs and Richardson Intervenors filed their applications for attorneys' fees with the federal district court. They requested a hearing concerning the fee applications, but the district court deemed it unnecessary.

On September 27, 2002, the district court issued an Opinion and Order concerning the attorneys' fees, awarding the Geier Plaintiffs' $376,587.50, although they had requested $5,000,000. *Geier v. Sundquist*, 227 F. Supp. 2d 881 (M.D. Tenn. 2002).[1] The district court used the lodestar method for calculating the fee award and concluded that $250 per hour was a reasonable hourly fee. It then determined that counsel for the Geier Plaintiffs should be compensated for 1432.55

---

[1]Although the court's opinion also determined a fee award for the Richardson Intervenors, the state ultimately reached an agreement with them and paid their attorneys' fees.

hours, which included 416 hours of undocumented time. Counsel urged the court to consider the so-called "*Johnson* factors," listed in *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974), either as bearing upon the lodestar amount or an enhancement thereof. But, for reasons that will be described in more detail below, the district court fixed the lodestar at $250 and deemed any enhancement legally unwarranted.

The Geier Plaintiffs' fee award – which covers the period between June 1987 and January 2001 – is the subject of this appeal. Pursuant to the 1984 Settlement, they received $85,000 in interim attorneys' fees in 1988; that is the only fee the Geier Plaintiffs have received to date.

## II. ANALYSIS

We review a district court's award of attorneys' fees for abuse of discretion. *Perotti v. Seiter*, 935 F.2d 761, 763 (1991). "An abuse of discretion exists when the district court applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 647 (6th Cir. 1993).

## A. *Common Fund/Common Benefit Method*

The Geier Plaintiffs' first claim on appeal is that the district court abused its discretion in declining to use the "common fund"/"common benefit" method (hereinafter "common fund") for determining attorneys' fees. Like the lodestar method, the common fund method is an exception to the general "American rule" that litigants pay their own attorneys' fees. It is employed where a lawyer recovers a common fund for the benefit of persons in addition to those he formally represents. As the Supreme Court has explained:

The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its

cost are unjustly enriched at the successful litigant's expense. Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing the attorneys' fees against the entire fund, thus spreading fees proportionately among those benefitted by the suit.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citations omitted). In order for a class to recover attorneys' fees pursuant to the common fund doctrine: (1) the class of people benefitted by the lawsuit must be small in number and easily identifiable; (2) the benefits must be traceable with some accuracy; and (3) there must be reason for confidence that the costs can in fact be shifted with some exactitude to those benefitting. *Aleyska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). The Supreme Court has stated that "[t]hose characteristics are not present where litigants simply vindicate a general social grievance." *Boeing*, 444 U.S. at 478. The criteria are met, however, "when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf." *Id.* As such, the common fund method is often used to determine attorneys' fees in class action securities cases, *see, e.g., Boeing,* 444 U.S. 472, and suits by union members against their unions, *see, e.g., Hall v. Cole*, 412 U.S. 1 (1973).

It was not an abuse of discretion for the district court to decline to use the common fund method in this case. In addition to the doctrine being inapplicable where litigants are vindicating a social grievance, the doctrine is inappropriate here because there is simply no fund. The benefit provided to the plaintiff class – the desegregation of Tennessee's system of higher education – is not pecuniary in any conventional way and did not result in the creation of a fund to be divvied up among the plaintiffs, as is the case in common fund cases. Although (as the Geier Plaintiffs urge) the benefits attained could perhaps be *measured* as pecuniary – in the sense that a dollar value could be assigned to the cost of the remedial

measures – transposing the action's social value into monetary value is imprecise, and more importantly, still leaves us without a fund. The money designated by Tennessee for the remedial programs goes to fund the programs, not to pay the plaintiffs. Moreover, applying the *Aleyska* factors, described above, the common fund method is unworkable here: the class of persons benefitted by this lawsuit is not at all small or manageable. Rather, according to the 2001 Consent Decree, the class includes "all residents of this State," *Geier*, 128 F. Supp. 2d at 521. As such, the class is not easily identifiable and the benefits could not be traced with any accuracy.

### B. *Reasonable Hourly Rate*

Having declined to use the common fund doctrine for calculating attorneys' fees, the district court instead used the lodestar approach whereby the court multiplies a reasonable hourly rate by the proven number of hours reasonably expended on the case by counsel. *Adcock-Ladd v. Secretary of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000). "The primary concern in an attorney fee case is that the fee awarded be reasonable, that is, one that is adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers." *Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999) (citing *Blum v. Stenson*, 465 U.S. 886, 893, 897 (1984). To arrive at a reasonable hourly rate, courts use as a guideline the prevailing market rate, defined as the rate that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record. *Adock-Ladd*, 227 F.3d at 350. The Geier Plaintiffs contend that the district court abused its discretion in finding $250 a reasonable hourly rate when they had both requested $400 per hour and submitted evidence that $400 was the reasonable hourly rate for lawyers of skill and experience comparable to George E. Barrett, the Geier Plaintiffs' lead counsel, litigating a civil rights action of this scale.

We recognize that deference is to be given to a district court's determination of a reasonable attorneys' fee. Nonetheless, it remains important for the district court to provide an adequate explanation of the reasons for its award and the manner in which that award was determined. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("it remains important for the district court . . . to provide a concise but clear explanation of its reasons for the fee award."). At times, we have found an abuse of discretion where a district court fails to explain its reasoning adequately or to consider the competing arguments of the parties. *See Moore v. City of Paducah*, 790 F.2d 557 (6th Cir. 1986).

Here, in determining the reasonable hourly rate, the district court appears to have relied almost exclusively on market data provided by Defendants, citing to local awards of approximately $250 per hour in civil rights cases. (The court also purported to rely on its own judicial experience, noting: "My recollection is not what it once was, but I cannot recall ever awarding a fee in excess of $250 per hour." *Geier*, 227 F. Supp. 2d at 886.). While this data is informative, the district court never mentioned that the Geier Plaintiffs' counsel requested $400 per hour, and the court never discussed any of the evidence submitted by the Geier Plaintiffs supporting a $400 per hour rate. Attorney Lewis R. Donelson, of Nashville, Memphis, and Knoxville's Baker, Donelson law firm, submitted an affidavit stating that a $450 hourly rate for Mr. Barrett was "fair and reasonable [and] not an uncommon rate for leading attorneys in Tennessee at this time," and that Mr. Barrett "is certainly the leading expert on civil rights desegregation cases." There were similar affidavits – attesting to the reasonableness of a $400 or $450 hourly fee – from five other attorneys. In addition, the Geier Plaintiffs point to the $400 per hour rate awarded attorneys in *Craft v. Vanderbilt University*, a federal class action from the Middle District of Tennessee alleging civil rights violations in connection with a 1940s medical experiment in which pregnant women unknowingly ingested radioactive iron isotope.

We also note that the district court determined that $250 per hour was the appropriate hourly rate for the McGinnis Intervenors' counsel, Messrs. Norris and Weatherly. The Geier Plaintiffs argued that they were more experienced and more active in the litigation than the intervenors' counsel, and that therefore, they are entitled to a higher hourly rate. We find this argument sensible. According to the record, Norris and Weatherly are less experienced than Mr. Barrett, and both were paid at lower hourly rates earlier in this lawsuit. *See Geier* 227 F. Supp. 2d at 883 (explaining that, in 1987, Norris was paid $90 per hour; Dinkins $125 per hour; and Barrett $150 per hour). Furthermore, by Mr. Norris's own admission, in a letter to Mr. Barrett dated February 2, 2001, he and Weatherly played a less "global" role in this action through the years.

In short, the district court's order contains no explanation of how – or even if – it accounted for the Geier Plaintiffs' competing information concerning the prevailing market rate. Absent some indication of how the district court's discretion was exercised, we have no way of knowing whether that discretion was abused. *See Chalmers v. City of Los Angeles*, 796 F.2d 1205 (9th Cir. 1986) (vacating award of attorneys' fees and remanding where district court's opinion insufficiently explained how it arrived at the fee amount). We are, therefore, unable to affirm the decision below.

Accordingly, the hourly rate determination as to the Geier Plaintiffs is vacated and we remand this matter for further review based upon the market data of record, including the Geier Plaintiffs' submissions.

## C. *The Johnson Factors*

The Geier Plaintiffs' last claim on appeal is that the district court abused its discretion in failing to consider the *Johnson* factors as bearing on the initial lodestar figure and any enhancement thereof. The Supreme Court has repeatedly stated that "[t]he primary concern in an attorney fee case is

that the fee award be reasonable." *Blum v. Stenson*, 465 U.S. 886, 893 (1984). As already discussed, the first step in determining a reasonable fee in a lodestar case is to multiply the number of hours reasonably expended on the litigation by a reasonable hourly rate. Once the lodestar figure is established, the trial court is permitted to consider other factors, and to adjust the award upward or downward to achieve a reasonable result. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). In considering any adjustment, the Supreme Court has cited with approval the twelve factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). *Hensley*, 461 U.S. at 430 n. 3, 434 n. 9. Those factors are:

(1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Johnson*, 488 F.2d at 717-19. The Supreme Court, however, has limited the application of the *Johnson* factors, noting that "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley*, 461 U.S. at 434 n. 9.

Since we are vacating the lodestar figure in light of the hourly rate issue discussed in Part II, Section B. above, there is no reason to address, at this time, the Geier Plaintiffs' contention that the district court failed to consider the *Johnson* factors in establishing that initial figure. However, we agree with the Geier Plaintiffs that the district court erred

by failing to consider an upward adjustment of the lodestar figure. To help explain why this is so, we set forth, in relevant part, the district court's analysis on this point. The district court stated:

Counsel urges the Court to consider the *Johnson* factors . . . either as bearing upon the lodestar amount or an enhancement thereof. . . . [The district court here lists the Johnson factors]. . . .

The one factor in *Johnson* that the Supreme Court felt may be still available is that of "risk." When the case was filed in 1968, there was substantial risk that the outcome might be unfavorable. Although *Brown v. Board* had been decided 14 years before, this case involved higher education and the law was unsettled. Risk was removed after Judge Gray's early decisions, and certainly was finally removed after the Stipulation of Settlement in 1984. Thereafter, the case only required monitoring for compliance. A flurry of activity in the case arose when the state sought dismissal under the decision in *Fordice*. When Attorney General Paul Summers took office and indicated a desire to settle the case, and initiated mediation, good will and innovative efforts on the part of all counsel and parties resulted in the Consent Decree. Therefore, under the teaching of [*Pennsylvania v. Delaware Valley Citizens' Council for Clear Air*, 478 U.S. 546 (1986) no enhancement is warranted and the Court fixes the lodestar at $250 per hour.

*Geier*, 227 F. Supp. 2d at 886-87 (emphasis in original).

Although the district court quoted from that part of *Delaware Valley* indicating that "adjustments of the lodestar figure are still permissible" in "rare" and "exceptional" cases, 478 U.S. at 565, the court never discussed whether this is such a special case. Instead, the district court stated that none of the *Johnson* factors are legally available as bearing on an

upward adjustment, except for "risk." The court then determined that there was no risk level in this case after the 1984 Settlement (a questionable conclusion in light of the state's efforts to dismiss the case in 1994, resulting in protracted litigation and negotiations resulting in a new Consent Decree in 2001; but this is not pressing to the issue now before us), and that therefore, "no enhancement [of the lodestar] is warranted." *Geier*, 227 F. Supp. 2d at 887.

Unfortunately, that analysis was not correct. The Supreme Court has emphasized that, although application of the *Johnson* factors is limited, upward adjustments are permissible in certain "rare" and "exceptional" cases. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564 (1986). We also note that the Supreme Court has not had occasion to individually address each of the factors; it has only provided specific guidance concerning some of them. In its clearest pronouncement concerning the *Johnson* factors, the Supreme Court held that neither the complexity nor novelty of the issues in a case is an appropriate factor in determining whether to increase the basic fee award. *Blum*, 465 U.S. at 898-99. With respect to risk – that is, the risk of not prevailing in the litigation – the Supreme Court has held this factor applicable only where the trial court specifically finds that the case is one of the "exceptional" cases in which an upward adjustment is appropriate and that there was real risk of not prevailing in the case. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 730-31 (1987). In addition, as a general rule, the upward adjustment for risk may be no more than one third of the lodestar, and "[a]ny additional adjustment [for risk] would require the most exacting justification." *Id.* at 730. Because the "rare" and "exceptional" determination must precede any risk analysis, the district court here was not even permitted to reach the risk analysis, having never considered whether this case is one of the rare and exceptional ones meriting an upward adjustment.

Of the factor pertaining to the quality of counsel's representation, the Supreme Court stated in *Blum* that it is "generally . . . reflected in the reasonable hourly rate," although it may still justify an upward adjustment "in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional'." *Blum*, 465 U.S. at 899. Similarly, with respect to the factor pertaining to the "results obtained," the Supreme Court stated that it "generally will be subsumed within other factors used to calculate a reasonable fee" and "normally should not provide an independent basis for increasing the fee award." *Id.* at 900. But the Supreme Court was careful to stress that it was not blanketly precluding consideration of "results obtained," but rather establishing a presumption that that factor is included in the initial lodestar figure but may still be considered as part of an upward adjustment in exceptional cases: "[W]e reiterate what was said in *Hensley*: 'where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhancement award may be justified." *Id.* at 901 (quoting *Hensley*, 461 U.S. at 435). Lastly, to underscore its point that certain *Johnson* factors – including the "results obtained" – are applicable to a trial court's consideration of an upward adjustment in exceptional cases, the Supreme Court explicitly reject[ed] petitioner's argument that an upward adjustment to an attorney's fee is never appropriate under § 1988. *Id.* at 901.

The last Supreme Court case to consider the *Johnson* factors in any depth reaffirmed *Blum*. In *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565 (1986) (hereinafter "*Delaware Valley*"), the Supreme Court noted that factors such as "the special skill and experience of counsel," the "quality of representation," and the "results obtained" from the litigation "are presumably fully reflected in the lodestar amount, and thus cannot serve

as independent bases for increasing the basic fee award." Again, however, the Supreme Court stated that "upward adjustments of the lodestar figure are still permissible" and are proper "in certain 'rare' and 'exceptional' cases." *Id.* at 565 (quoting *Blum,* 465 U.S. at 898-901). In *Delaware Valley*, the Supreme Court does not purport to expand *Blum* in any way. Accordingly, we must construe its statement that certain *Johnson* factors "cannot serve as independent bases for increasing the basic fee award," *id.*, not in isolation or as precluding use of those factors altogether, but rather in light of (1) the statements that precede it – namely that the named factors are *"presumably"* reflected in the lodestar fee, but not certainly so; (2) the statements that follow it, reiterating that upward adjustments are permissible in "rare" and "exceptional" cases; and (3) *Blum*, the case that that portion of *Delaware Valley* is summarizing, which preserved the use of the "results obtained" and the "quality of representation" for an upward adjustment analysis in those "rare" and "exceptional" cases.

Here, the district court neither found this case exceptional nor unexceptional – and as such, should not have even reached the risk analysis that it performed. Moreover, as we have explained, it is not the case, as the district court believed, that all of the *Johnson* factors are no longer available as bearing on an adjustment of the lodestar figure. Certain factors – such as the "results obtained" – are still relevant, following the predicate determination that the case is one of the rare and exceptional ones meriting an upward adjustment. Because the district court applied the wrong legal standard to the upward adjustment analysis – and also seemed to imply, in error, that upward adjustments are no longer even permissible – we find an abuse of discretion. *First Tech. Safety Sys.*, 11 F.3d at 647 ("An abuse of discretion exists when the district court applies the wrong legal standard. . . .").

Nor are we satisfied that the district court engaged in the proper legal analysis simply because it quoted from the germane part of *Delaware Valley*. To cite a standard is not

the same as applying it, particularly where the court has overlooked several of the most important elements of the standard – in this case, the continuing permissibility of upward adjustments in exceptional cases and the relevance of certain *Johnson* factors to that adjustment.

The Geier Plaintiffs have asserted that this is one of those "rare" and "exceptional" cases meriting an upward adjustment of the lodestar figure. The appropriate legal analysis begins with consideration of that question. As detailed in Part I of this opinion, the magnitude of this case is formidable in numerous respects. The legal principles advanced by the Geier Plaintiffs were pathbreaking and of great social import. It was in this case that this Court first held that there was an affirmative duty to remove all vestiges of state-imposed segregation in institutions of public higher education, just as there was such an obligation at lower educational levels. Plaintiffs have litigated – successfully – for thirty-six years against continuous state opposition and contrary judicial precedents outside this Circuit, and they have secured injunctive relief – valued at approximately $320 million – in programs affecting all public institutions of higher education in the state of Tennessee.

When this case was filed, it focused the federal judiciary on the desegregation of public higher education. *See* Decl. of David Williams, II, Vice Chancellor for Student Life and University Affairs and General Counsel and University Secretary, Vanderbilt University ¶¶ 6-14. (JA 554-56.) Defendants had argued that a good faith, open door policy of admissions satisfied the requirements of the Fourteenth Amendment for racial equality in public institutions of higher education. Their argument was based on an interpretation of the outcome of a civil rights action in Alabama, in which a federal district court denied the plaintiffs injunctive relief concerning state officials' plans to expand a previously white campus near a historically black college in Montgomery, Alabama. The U.S. Supreme Court had summarily affirmed. *See Alabama State Teachers Ass'n v. Alabama Pub. Sch. and*

*Coll. Auth.*, 289 F. Supp. 784, 787 (M.D. Ala. 1968), *aff'd* 393 U.S. 400 (1969) (hereinafter "*ASTA*"). The opinion in *ASTA* and the Supreme Court's summary affirmance led some to believe that an open door policy alone was sufficient to remedy *de jure* segregation in higher education. It was *Geier* that steered the jurisprudence in a different direction and became the basis for concerted efforts by the Office of Civil Rights of the Department of Education and the Department of Justice's Civil Rights Division to persuade courts that open door policies were insufficient (and, on their own, ineffective) to achieve desegregated systems of public higher education in the South. *See* Declarations of David Williams, II (JA 554-557) and Rita Sanders Geier (JA 510-517). Those efforts included lawsuits brought in Virginia, Alabama, Mississippi, and Louisiana. In the Virginia case, *Norris v. State Council of Higher Educ. for Virginia*, 327 F. Supp. 1368 (E.D. Va. 1971), the court explicitly relied on the district court opinion in *Geier* to reject arguments by the state defendants that a state could discharge its duty to dismantle a previously *de jure* segregated system simply by declaring open enrollment.

The exceptional nature and national significance of this case was further exemplified in 1997, when the U.S. Department of Justice's Civil Rights Division celebrated its fortieth anniversary. Speakers included members of Congress, the U.S. Attorney General, Department of Justice officials, and Rita Sanders Geier, the lead original plaintiff in this action.

All of this, combined with the tenacity of the attorneys and broad remedies obtained – described in Part I above – render this a "rare" and "exceptional" case. Having held that this case is exceptional within the meaning of *Blum* and *Johnson*, an upward adjustment is permissible and we remand to the district court for the particularized application of factors – including "results obtained" – bearing on the amount of any upward adjustment.

## III. CONCLUSION

For the reasons set forth above, we VACATE the district court's award of attorneys' fees to the Geier Plaintiffs and REMAND for: (1) further explanation concerning the hourly rate; (2) calculation of the lodestar figure; and (3) determination of any upward adjustment.

---

**DISSENT**

---

COOK, Circuit Judge, dissenting.  Because I conclude that the district court did not abuse its discretion in (1) determining that $250 was a reasonable hourly rate for the Geier plaintiffs' counsel, and (2) refusing to apply an upward adjustment to the lodestar amount, I respectfully dissent from parts II.B and II.C of the majority's opinion.

### A.  The Reasonable Hourly Rate

As the majority notes, a district court must provide a "concise but clear explanation of its reasons for the fee award." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  A district court abuses its discretion when it "relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000) (citation omitted).  This court may also find an abuse of discretion "when [we are] firmly convinced that a mistake has been made." *Id.* at 349 (citation omitted).

In determining the reasonable hourly rate for the Geier plaintiffs' counsel, the district court did not rely on clearly erroneous findings of fact, improperly apply the law, or use an erroneous legal standard.  Instead, the district court used the "prevailing market rates in the relevant community" to set the reasonable hourly rate, surveying the hourly rates awarded to highly experienced counsel in civil rights and class action cases in Tennessee. *Blum v. Stenson*, 465 U.S. 886, 895 (1984) (holding that "'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community").  Although the district court did not expressly reject the Geier plaintiffs' arguments supporting their request for a $400 hourly rate, the district court's opinion reflects its rejection of the figure as exceeding the

prevailing market rate in the relevant community. *Geier v. Sundquist*, 227 F. Supp. 2d 881, 886 (M.D. Tenn. 2002) ("This Court therefore finds that the prevailing market rate that lawyers of comparable skill and experience can reasonably expect to command within the Middle District of Tennessee for this type of work is $250 per hour.").

Citing *Moore v. City of Paducah*, 790 F.2d 557 (6th Cir. 1986), the majority infers an abuse of discretion from the absence of explicit commentary in the district court's opinion about the competing arguments of the Geier plaintiffs.  The *Moore* court, however, defined abuse of discretion in the context of a district court's ruling on a motion to amend the pleadings, and since that decision, this court has cited the *Moore* definition only in that context.  This court has not previously held that a district court, having determined a reasonable hourly fee using evidence of the prevailing market rate in the relevant community, abused its discretion in failing to explicitly discuss the arguments of one of the parties, and we should not do so here.

I conclude that under the highly deferential standard this court applies in reviewing statutory fee awards, the district court's determination that $250 constitutes the reasonable hourly rate for the Geier plaintiffs' counsel was not an abuse of discretion.  Although discussing the Geier plaintiffs' arguments in favor of a $400 hourly rate may have further clarified the district court's decision, the lack of such a discussion does not leave me "firmly convinced that a mistake has been made." *Adcock-Ladd*, 227 F.3d at 349.

### B.  The *Johnson* Factors

The majority concludes that the district court misstated the Supreme Court's holding in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546 (1986), concerning a district court's assessment of the *Johnson* factor of "risk" when considering an upward adjustment. *Geier*, 227 F. Supp. 2d at 887 ("[t]he one factor in *Johnson* that the

Supreme Court felt may be still available is that of 'risk'"). I respectfully disagree, however, because when taken in context, the district court's opinion reflects an understanding of the Supreme Court's view in *Delaware Valley* regarding risk analysis. *Delaware Valley*, 478 U.S. at 568 (leaving unresolved "the question of upward adjustment, by way of multipliers or enhancement of the lodestar, based on the likelihood of success, or to put it another way, the risk of loss"). The district court, in an extended quote from *Delaware Valley*, acknowledged that a court's determination of the reasonable hourly rate most likely already accounts for most, if not all, of the *Johnson* factors, with risk as the factor remaining to be considered at the upward-adjustment stage of the lodestar analysis.

The district court's opinion details its reason for denying an enhancement of the lodestar amount. Judge Wiseman evaluated the risk here to be insufficient to warrant an upward adjustment because the period for which the Geier plaintiffs' counsel sought fees encompassed only "monitoring for compliance," with an occasional "flurry of activity." "Generally, the trial judge's exercise of discretion in statutory fee award cases is entitled to substantial deference, especially when the rationale for the award was predominantly fact-driven." *Adcock-Ladd*, 227 F.3d at 349.

Given the substantial deference this court accords a district court's fee award when the district court provides a non-erroneous legal and factual basis for its decision, I would affirm the fee award here. Because the majority does not, I respectfully dissent.